## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ : | | |
| THEIA TECHNOLOGIES, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 2:20-cv-00097-GEKP |
| | : | |
| THEIA GROUP, INCORPORATED, | : | |
| | : | |
| -- and -- | : | |
| | : | |
| THEIA HOLDINGS A, INC. | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants.. | : | |
| _____ : | | |

**MEMORANDUM OF DEFENDANTS THEIA GROUP, INCORPORATED AND THEIA HOLDINGS A, INC. IN OPPOSITION TO PLAINTIFF THEIA TECHNOLOGIES, LLC'S MOTION FOR PRELIMINARY INJUNCTION**

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ……………………………………………………………… (i)

I.      SUMMARY …………………………………………………….……………..…… 1

II.     STATEMENT OF THE CASE …………...…..……………………………………… 1

        Theia Group, Incorporated and Theia Holdings A, Inc., Defendants ……………………….. 1

        Other Users of "Theia" …………………………………………………………… 6

III.    ARGUMENT          ……………………….……………………………………………… 9

        A.      Plaintiff is Not Entitled to a Preliminary Injunction ……………………………… 9

                1.      Plaintiff Cannot Establish Irreparable Harm ……..…………………..……… 9

                a.      Defendants' Satellite Products and Services Are Years Away …………… 10

                b.      Plaintiff's Alleged Harm Is Outside This Court's Jurisdiction
                        and Arises from Plaintiff's Own Doing ……………………………………… 11

                2.      Plaintiff Cannot Establish a Likelihood of Success on the Merits …………… 12

                a.      There is No Likelihood of Confusion ……………………………………… 13

                        Factor 1: There Are Differences Between the Marks …………..………. 13

                        Factor 2: Strength of the Plaintiff's Asserted Marks …………………... 16

                        Factor 3: Other factors indicating the care and attention
                        one expects would be given when making a purchase ……………………… 18

                        Factor 4: The Length Of Time The Alleged Infringer Has
                        Used The Mark Without Evidence Of Actual Confusion
                        Arising; and Factor 6: Evidence of Actual Confusion ……………………… 22

                        Factor 5:  The Intent Of The Alleged Infringer In Adopting The Mark...23

                        Factor 7: Whether The Goods Are Marketed Through
                        The Same Channels …………………………………………………………27

                        Factor 8: The Extent To Which The Target Markets Are The Same…….27

                        Factor 9: the perceived relationship of the goods, whether

because of their near-identity, similarity of function, or other factors ...29

    b.      There is No Reverse Confusion ...............................................................

    c.      Plaintiff's "Blue Ring" Mark Does not Provide Rights
          to The Color Blue ...................................................................................

    3.      A Preliminary Injunction Would Work a Hardship for Defendants

    4.      The Public Interest Is Not Served By an Injunction ...............................

B.     A Substantial Injunction Bond Would Be Required................................................

*Cases*

A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3d Cir. 2000) ...............24

Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,
    42 F.3d 1421 (3d Cir. 1994) ......................................................................................... 10

Arrowpoint Capital Corp. v. Arrowpoint Asset Management, LLC,
    793 F.3d 313 (3d Cir. 2015) ............................................................................. 10, 14, 15

Buzz Bee Toys, Inc. v. Swimways. Corp., 20 F. Supp. 3d 483, 513 (DNJ 2014) .......................12

Citizens In. Grp. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110 (3d Cir. 2004)...................24

Covidien Sales LLC v. Ethicon Endo-Surgery, Inc., No. 3:14-cv-917,
    2014 WL 5242872 (D. Conn. Oct. 15, 2014)...................................................................36

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388,
    126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) ........................................................................11

Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205 (3rd Cir. 2014)................................11

Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt. Inc.,
    618 F.3d 1025 (9th Cir. 2010)............................................................................................18

Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411 (4th Cir. 1999).............................36

Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983) .........................................................15

Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004) ...................................................10

Lab. Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447 (M.D.N.C. 2015)............................35

Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352 (9th Cir. 1985)..........................................32

MarketQuest Grp. Inc. v. BIC Corp., 11-cv-118 (November 7, 2011, S.D. Cal. 2011)................18

Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883 (7th Cir. 2000)...........................................35

Nutra-Sweet Co. v. Vit-Mar Enters., Inc., 176 F.3d at 153 (3d Cir. 1999) ..................................10

One Indus., LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154 (9th Cir. 2009).............................24

OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., No. 2:14-CV-00085
    (E.D. Wash. December 19, 2018)........................................................................................35

Punnett v. Carter, 621 F.2d 578 (3d Cir. 1980)..............................................................11

Rauch Indus., Inc. v. Radko, No. 3:07-CV-197C, 2007 WL 3124647
    (W.D.N.C. Oct. 25, 2007) ...............................................................................................35

Vynamic, LLC v. Diebold Nixdorf, Inc., 2019 U.S. Dist. LEXIS 101661;
    2019 U.S.P.Q.2D 224293 (ED Pa. 2019) ..............................................................25, 31

Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7,
    129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ..........................................................................11

*STATUTES*

15 U.S.C. §1062.................................................................................................................6

15 U.S.C. §1064...............................................................................................................16

15 U.S.C. §1065...............................................................................................................16

15 U.S.C. §1057(b)...........................................................................................................16

*RULES*

Fed.R.Civ.P. 65(c)………………………………………………………….……..........35-36

*REGULATIONS*

37 C.F.R. §2.80 .................................................................................................................6

*OTHER AUTHORITIES*

TMEP § 1502.....................................................................................................................6

# I.    SUMMARY

Theia Group, Incorporated and Theia Holdings A, Inc. (collectively "Theia Group"), Defendants in this civil action, are companies in the satellite industry, and are the owners of two US trademark applications allowed by the USPTO for the marks THEIA and T THEIA and Earth Logo (the Theia Group marks).  (Bonini Decl. Exs. 1 and 2) Theia Group also has a number of foreign trademark registrations for the Theia Group marks. (Bonini Decl. Exs. 27 and 28) Theia Group has made a significant investment in its trademarks. Theia Group has obtained FCC approval for a constellation of satellites through which Theia Group will utilize to carry out its services.  (Doc. No. 1, Complaint ¶ 31) Theia Group's US trademark applications were examined and approved by the USPTO examiner.  (Bonini Decl. Exs. 1, 2, 3, 4) During Examination of the Theia Group trademark applications, the USPTO examining attorney did not raise an issue over the Plaintiff's THEIA trademark registrations.  (Id., Ex. 3 and 4) Defendants International Trademark registration also was approved in the EU.  (Bonini Decl. Exs. 25 and 26) There has been no actual confusion between the Plaintiff or Defendant companies or Defendants Theia Group's activities and anticipated products. Both Plaintiff's lens products and Defendants' satellite system are directed to highly sophisticated consumers (including sovereign nations and industrial entities).

There is no likelihood of confusion in the present case and the Plaintiff's motion should be denied.

# II.    STATEMENT OF THE CASE

## Theia Group, Incorporated and Theia Holdings A, Inc., Defendants

Theia Group, Incorporated and Theia Holdings A, Inc. (collectively "Theia Group") are satellite communication companies, which on November 15, 2016 applied for and, which in May

of 2019, received approval from the FCC to construct, launch, and operate a non-geostationary-satellite orbit (NGSO) fixed-satellite service, mobile-satellite service, and earth exploration-satellite service constellation consisting of 112 satellites, through which, when launched and operational, will allow Theia to provide high-resolution earth-imaging data in the United States and globally. (Doc. No. 2, Homen Decl. Ex. 14, Excerpt of FCC Memorandum, Released May 10, 2019)

The Theia satellite constellation will form part of a global remote sensing and communications system that will have capabilities of obtaining, processing and delivering remote sensing, analytics, and broadband connectivity. Theia will carry this out through an integrated communications network. To carry out the Theia communications and analytics services Theia will capture continuous visible and broad infrared video of the entire Earth near continuous high-resolution hyperspectral and active radar data, and microwave radiometer data. The data packages will be provided to the Theia consumers, which include sovereign nations and industrial entities. The Theia satellite communications obtained through the use of the TSN also may be used for first responder support, as well as infrastructure monitoring.

The Theia Group's communications are designated to operate within particular frequency bands for which Theia Group has sought and obtained approval:

| Operations | Frequencies |
|---|---|
| Remote Sensing | 1215-1300 MHz |
| Gateway | 17.8-18.6 GHz (space-to-Earth) |
| | 18.8-19.4 GHz (space-to-Earth)[15] |
| | 19.6-20.2 GHz (space-to-Earth) |
| | 25.5-27.0 GHz (space-to-Earth) |

| | |
|---|---|
| | 27.5-29.1 GHz (Earth-to-space)[16] |
| | 29.5-30.0 GHz (Earth-to-space) |
| | 37.5-42.0 GHz (space-to-Earth)[17] |
| | 47.2-50.2 GHz (Earth-to-space) |
| | 50.4-51.4 GHz (Earth-to-space) |
| User | 10.7-12.7 GHz (space-to-Earth) |
| | 12.75-13.25 GHz (Earth-to-space) |
| | 14.0-14.5 GHz (Earth-to-space) |

The communications are the backbone of the "Theia Satellite Network" (or "TSN"). Theia Group's data packaging and services are offered (and in some cases provided free of charge) to assist sovereign nations, as well as industrial entities to better manage data through the implementation of the TSN and its operation to provide real-time global information of the entire earth at the same time.

Theia Group's data and services will be provided through its TSN, and the users and consumers for the Theia satellite communications and Theia's data services and information products are highly sophisticated, as they are government entities, or highly developed industrial entities (insurance companies).

Theia Group has filed intent to use applications in the United States Patent and Trademark Office, and has filed International Trademark Applications for its Theia trademarks (including its THEIA mark and its logo mark THEIA and Earth Logo). (Doc. 1, Complaint ¶¶ 32, 33; and Bonini Decl. Exs. 1 and 2; and Exs. 27 and 28)

Defendant Theia Group's US trademark applications are limited to satellite-related products and services:  "satellite hardware" and services that are specified to involve the "operation and use of satellite equipment":

> IC 009. US 021 023 026 036 038. G & S: **Satellite hardware**, namely, computer hardware, satellite receivers, satellite dishes, satellite transceivers, electronic data sensors, remote sensors for use in measuring and monitoring activity taking place on, above and below the earth's surface, and associated software for controlling the aforementioned hardware for collecting, processing, analyzing and reporting data, and backhauling data from another orbiting constellation of satellites, which replaces some or all of the need for the constellation satellites to downlink directly to earth on their own; modules, namely, computer memory, and integrated circuit modules **for backhauling data from another orbiting constellation of satellites**, where the aforementioned replaces some or all of the need for the constellation satellites to downlink directly to earth on their own

> IC 042. US 100 101. G & S: Remote electronic monitoring via **operation and use of satellite equipment** using computers and sensors for the analysis of data via visible and non-visible electromagnetic wavelengths, such that materially all of the available wavelengths and/or spectrum necessary to perform subsequent analytics tasks are obtained at once, and/or at a rate faster than the underlying activity rate of the industry, activity or process being observed; spectral analysis of data via visible and non-visible electromagnetic wavelengths and data analysis for commercial, agricultural, geologic, energy and industrial fields, and for monitoring and identifying and differentiating activity, objects and/or living beings, taking place on, above and/or below the earth's surface, especially where the quality of the analytics are sufficient to replace human decision making

(Doc. 1, **Complaint** ¶ 32, emphasis added)

Defendant Theia Group's marks have appears on its web site, as follows[1]:



Theia Group's marks are also the subject of International Registrations, including Registrations in a number of countries (Bonini Decl. Exs. 27 and 28):

---

[1] Defendants Theia Group on their web site and letterhead use the THEIA Logo mark and "THEIA" in the capitalized letter font-style, however, Defendants' already approved USPTO trademark applications are, respectively, for the THEIA Logo mark form and the typed word form "THEIA" (not limited to a particular font).

| Theia Group Mark: THEIA | | | | Theia Group Mark: THEIA Logo | |
|---|---|---|---|---|---|
| *Country* | | *Status* | *Country* | | *Status* |
| US | | Notice of Allowance | US | | Notice of Allowance |
| Australia | | Registered | Bahrain | | Registered |
| Bahrain | | Registered | Switzerland | | Registered |
| Switzerland | | Registered | Ghana | | Registered |
| Ghana | | Registered | Indonesia | | Registered |
| Indonesia | | Registered | India | | Registered |
| India | | Registered | Japan | | Registered |
| Japan | | Registered | Kyrgyzstan | | Registered |
| Kyrgyzstan | | Registered | Korea | | Registered |
| Mexico | | Registered | Mexico | | Registered |
| New Zealand | | Registered | New Zealand | | Registered |
| African IP Organization | | Registered | African IP Organization | | Registered |
| Oman | | Registered | Oman | | Registered |
| Russian Federation | | Registered | Russian Federation | | Registered |
| Singapore | | Registered | Singapore | | Registered |
| Thailand | | Registered | Thailand | | Registered |
| Tajikistan | | Registered | Tajikistan | | Registered |
| Turkmenistan | | Registered | Turkmenistan | | Registered |
| Turkey | | Registered | Ukraine | | Registered |
| Uzbekistan | | Registered | Uzbekistan | | Registered |
| Zambia | | Registered | Zambia | | Registered |
| Zimbabwe | | Registered | Zimbabwe | | Registered |

The USPTO Examining Attorney who has expertise in the field of trademark confusion issues, considered each of Defendant Theia Group's THEIA trademarks, and the respective listed goods and services, and determined that there is no likelihood of confusion between them and the Plaintiff's marks. (Bonini Decl. Exs. 3 and 4) Plaintiff's marks and registrations were not cited by the US Examiner against Defendant's THEIA marks. (Id.) Theia Group received Notices of Allowance in both of its USPTO trademark applications, respectively for THEIA and the T THEIA Logo mark (shown above).[2] (Bonini Decl. Exs. 1 and 2)  Theia Group's EU trademark

---

[2] "After examination of an application is completed and *the examining attorney determines that the mark is entitled to registration on the Principal Register*, the mark is published in the *Official Gazette* of the USPTO for opposition. 15 U.S.C. §1062;  37 C.F.R. §2.80." (TMEP § 1502 (emphasis added))

applications for Theia Group's THEIA marks were also approved in the EU (subject to any opposition) and were published for an opposition period. (Bonini Decl. Exs. 25 and 26)

Despite the apparent approvals in the US and EU, with the US examiner concluding that there was no likelihood of confusion between Theia Group's marks and the applied for goods and services and Plaintiff's marks and its goods, Plaintiff commenced Opposition proceedings in the EU against each of Defendant Theia Group's EU Registrations. On or about August 2019, counsel for Plaintiff sent correspondence to Theia Group threatening that, at some time in the future should Theia be issued its US registrations for the allowed Theia trademark applications, Plaintiff would move to cancel those registrations and indicating that it had already opposed the Theia Group's EU trademark application.[3] (Doc. No 2, Homen Decl. Ex. 19).

Theia Group's US trademark applications were published for an opposition period, but neither Plaintiff nor any other party opposed them, and Notices of Allowance were granted. (Bonini Decl. Ex. 1 and 2)

**Other Users of "Theia"**

Plaintiff and Defendant are not the only users of THEIA. Because "Theia" relates to the Titan goddess of sight (and sometimes the sky and heavens), "Theia" has been adopted as a mark for "sight" pertaining products.[4]

---

[3] In the US, Defendants Theia Group would need to make use of the marks with the listed goods and services of its US trademark application and file a use statement prior to the US issuing a trademark registration, so Plaintiff could not cancel the Theia Group trademark registrations, since they have not registered.

[4] Titan, in Greek mythology, any of the children of Uranus (Heaven) and Gaea (Earth) and their descendants. According to Hesiod's Theogony, there were 12 original Titans: the brothers Oceanus, Coeus, Crius, Hyperion, Iapetus, and Cronus and the sisters Thea, Rhea, Themis, Mnemosyne, Phoebe, and Tethys. (Bonini Decl. Ex. Ex. 20, https://www.britannica.com/topic/Titan-Greek-mythology); and see the Theoi Project  (Bonini Decl. Ex. 19, https://www.theoi.com/Titan/TitanisTheia.html).

For example, the use of "Theia" below is neither Plaintiff's nor Defendants' mark, but represents use of a "Theia" mark by another party for computer software:

[5]

A number of Theia registrations are noted from the USPTO records, demonstrating the lack of likely confusion between the marks and products, as the USPTO has permitted the following marks and listed goods/services to co-exist.

A number of THEIA containing marks are included on the USPTO records[6]:

---

[5] US Trademark Reg. No. 5,200,801 (referenced in chart below), and see Bonini Decl. Ex. 29)
[6] Copies of the US Trademark Records are attached as Bonini Decl. Exs. 5-11)

| MARK | Goods/services | STATUS | Owner | Registration Number |
|---|---|---|---|---|
| THEIA RT | computer software for creating computer-generated images | Registered | Optis | 4,266,281 |
| THEIA | Computer software that integrates with existing business management intelligence software to improve navigation and user interface; Computer software that provides real-time, integrated business management intelligence by presenting information from various databases in an easy-to understand user interface; Computer application software for personal computers or servers, namely, software to streamline and simplify use of business intelligence software; Computer software to manage, analyze, retrieve, monitor, maintain, report on, structure, model, forecast, present and display data and information from various databases. | Registered | Motio, Inc. | 5,200,801 |
| THEIA LENS | Downloadable computer software that integrates with existing business management intelligence software to improve navigation and user interface; Downloadable computer software that provides real-time, integrated business management intelligence by presenting information from various databases in an easy-to-understand user interface; Downloadable computer application software for personal computers or servers, namely, software to streamline and simplify use of business intelligence software; Downloadable computer software to manage, analyze, retrieve, monitor, maintain, report on, structure, model, forecast, present and display data and information from various databases | Allowed | Motio, Inc. | (Approved Application Pending - 88/401,231) |
| THEIA | Computer software for use in ophthalmic testing; and | Allowed | Maculogix, Inc. | (Approved Application Pending - 88/190,515) |
| | IC 042. US 100 101. G & S: Software as a Service (SAAS) featuring computer software for use in ophthalmic testing | | | |
| THEIA360 | business data analysis related to medical provider referral patterns and medical provider efficacy; collection and analysis of quality metric data for a network of health care providers for business purposes in the field of medical provider referral patterns and medical provider efficacy; business consulting services in the field of medical provider patterns and medical provider efficacy; providing business reports in the field of medical provider patterns and medical provider efficacy. FIRST USE: 20170518. FIRST USE IN COMMERCE: 20170518; and | Registered | TechSolve, Inc. | 5,664,052 |
| | Cloud computing featuring software for use in analysis and analytics of medical provider referral patterns and medical provider efficacy; providing a website featuring on-line non-downloadable software that enables users to analyze medical provider referral patterns and medical provider efficacy; data mining services in the field of medical provider referral patterns and medical provider efficacy. FIRST USE: 20170518. FIRST USE IN COMMERCE: 20170518 | | | |

| | | | | |
|---|---|---|---|---|
| THEIA VAULT | -cloud computing featuring software for use in collecting, organizing, managing, storing, updating, and providing access to personal information and documents, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, healthcare directives, healthcare consents, and HIPAA authorization forms. FIRST USE: 20161214. FIRST USE IN COMMERCE: 20161214 | Registered | Theia Healthcare, LLC | 5,383,666 |
| THEIA EMERGENCY RESPONSE SYSTEM | C 035. US 100 101 102. G & S: estate management, namely, assistance in the collection and organization of personal vital documents and financial records, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, advance directives, healthcare consents, and HIPAA authorization forms, in conjunction with instructions for handling of such documents by others, including executors and attorneys, upon death or when otherwise necessary. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | Registered | Theia Healthcare, LLC | 5,383,665 |
| | IC 039. US 100 105. G & S: archival services, namely, collection and storage of records and documents in the nature of personal documents and information, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, advance directives, healthcare consents, and HIPAA authorization forms. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |
| | IC 042. US 100 101. G & S: cloud computing featuring **software** for use in collecting, organizing, managing, storing, updating, and providing access to personal information and documents, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, healthcare directives, healthcare consents, and HIPAA authorization forms; electronic storage of files and documents in the nature of personal documents and information, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, advance directives, healthcare consents, and HIPAA authorization forms. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |
| | IC 044. US 100 101. G & S: consulting in the field of geriatric health care management. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |
| | IC 045. US 100 101. G & S: in-home support services to senior persons, namely, geriatric care management services in the nature of the coordination of necessary services and personal care for older individuals; personal concierge services for others comprising making requested personal arrangements and reservations, running errands, and providing customer specific information to meet individual needs; providing non-medical personal assistant services for others in the nature of planning, organizing, coordinating, arranging, and assisting individuals to perform daily tasks; providing patient advocate services in the field of geriatric care; consulting in the field of geriatric care management in the nature of consulting in the coordination of necessary services and personal care for older individuals; geriatric care management services in the nature of strategic planning for the coordination of necessary services and personal care for older individuals. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |

Consumers already have to distinguish between a plurality of uses of "Theia" in connection with products and services, including software, and optics, and products relating to sight or vision. There is no likelihood of confusion between a satellite company's use of a mark for its satellite system and satellite operations and data analytics services, and a company using a mark for selling lenses and related software to operate the lenses. After all, the test is whether there is a likelihood of confusion, consumer confusion, not whether a plaintiff thinks that its product might have some use in a defendant's industry.

## III. ARGUMENT

Plaintiff is not entitled to a preliminary injunction, as there is no irreparable harm, the parties are not competitors, and Defendants are years away from their constellation of satellites being constructed, launched and operative.

### A. Plaintiff is Not Entitled to a Preliminary Injunction.

Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." Arrowpoint Capital Corp. v. Arrowpoint Asset Management, LLC, 793 F.3d 313, 318 (3d Cir. 2015) quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994).

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). The "failure to establish any element [of that test] renders a preliminary injunction inappropriate." Nutra-Sweet Co. v. Vit-Mar Enters., Inc., 176 F.3d at 153 (3d Cir. 1999).

When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is 'particularly heavy.' Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980).

### 1.      Plaintiff Cannot Establish Irreparable Harm

The Court may take up the second prong of the factor test here first and readily dispense of Plaintiff's preliminary injunction motion because Plaintiff cannot establish irreparable harm under the circumstances.  Plaintiff is not likely to prevail for a number of reasons, one being that Plaintiff's purported harm is not irreparable.

Irreparable harm is not presumed, rather a plaintiff must establish that factor (as well as the others) in order to be entitles to a preliminary injunction.  A party bringing a claim under the Lanham Act is not entitled to a presumption of irreparable harm when seeking a preliminary injunction and must demonstrate that irreparable harm is likely.  Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205 (3rd Cir. 2014), citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), and Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

### a.      Defendants' Satellite Products and Services Are Years Away

Defendant just recently, in 2019, was granted permission by the FCC to launch its network of 112 satellites, but that will not happen overnight.  (Doc. No. 2, Homen Decl. Ex. 14, excerpt from FCC May 10, 2019 Memorandum).[7]  The Defendants' satellite network (the TSN) will not be operational until at least the time when this Court will have decided this civil action. It will not be until at least 2023 at the earliest, and more likely not until at least after 2023, before Defendants Theia Group will launch and operate the TSN and provide the data analytics and

---

[7] On Defendants' application to the FCC filed November 15, 2016.

products. Plaintiff clearly understands this, as its own evidence indicates that Theia will not commence its satellite operations until 2023. (See Doc. No. 2, Homen Decl. Ex. 20, "Starting June 30 2023, Theia will start photographing the entire globe at a resolution of ½ meter per shot per second . . . " and "Given reasonable development time, 2023 seems like an ambitious target for a private space operator to develop, test, build and deploy a planetary satellite network.")

Plaintiff even acknowledges that Defendants' trademark applications are "intent-to-use" filings[8], further pointing to the fact that Defendants' usage of the marks is not being made at present, but will be at some future time. Defendants used their respective names, Theia Group, Incorporated, and Theia Holdings A, Inc. in applications before the FCC, but it has taken three years just to obtain the approval, and, it likely will take another three years before Defendants actually provide the products and services (which are not even the same products or services that Plaintiff claims to provide). Defendants also have a web site on which the marks appear, but Defendants' operation of its web site does not give rise to irreparable harm.

In view of the circumstances, Plaintiff will not suffer harm, and moreover Plaintiff cannot show that irreparable harm is likely and not merely a possibility. Buzz Bee Toys, Inc. v. Swimways. Corp., 20 F. Supp. 3d 483, 513 (DNJ 2014) (irreparable harm must be likely not merely possible). Even if actual infringement is taking place (which it is not here), that still is not enough to establish entitlement to a preliminary injunction.

**b.** **Plaintiff's Alleged Harm Is Outside This Court's Jurisdiction and Arises from Plaintiff's Own Doing**

The harm that Plaintiff sets out is not even a subject that this Court has jurisdiction to remedy, and what Plaintiff complains of appears to be brought about by its own actions. In Plaintiff's President's declaration, at par. 12, mention is made of harm being outside of this

---

[8] (Doc. No. 1, Complaint ¶ 34)

Court's jurisdiction, namely the *foreign registrations* of Defendants. (Doc. No. 2, Gohman Decl. ¶ 12) Plaintiff then asserts this as a basis for irreparable harm, but that is not a matter that a preliminary injunction can regulate.

It is noted that Plaintiff appears to have decided not to renew its Japanese trademark registration for the mark THEIA, allowing it to expire (see Bonini Decl. Exs. 12 and 13), and then appears to have filed to obtain another International Registration designating Japan. (Bonini Decl. Ex. 14). Plaintiff's registration in Japan was refused. (Bonini Decl. Ex. 15). Defendants already have obtained their registrations for Defendants' THEIA marks in Japan, which have earlier priority dates than Plaintiff's registration, and which was cited as a basis of refusal against Plaintiff's registration in Japan. (Id.) Any hardship or harm alleged by Plaintiff would appear to be on the part of Plaintiff's own conduct and not that of the Defendants.

Plaintiff is the aggressor in opposing Defendants' EU trademark registrations. The EU Intellectual Property Office approved Defendants' EU Registrations which meant that the Plaintiff's EU registration could coexist with Defendants' EU registrations. However, Plaintiff was not content with that, and decided to file Oppositions against the Defendants' EU trademark registrations. Plaintiff now comes to this Court seeking relief for what Plaintiff complains to this Court are Defendants' registrations "blocking" Plaintiff's foreign registrations (which is not even within the Court's jurisdiction). Plaintiff by its own conduct has set a trademark avalanche in motion, and now seeks to blame Defendants for its consequences, and seeks the Court's assistance to dig it out.

Plaintiff also claims that it was reaching out to Defendants with its letter in August of 2019, but did so not *prior* to filing the opposition against Defendants' registration in the EU, but only *after* the filing had been made. (Doc. No. 2, Ex 19 to Homen Decl.) In addition,

Defendants' EU registration that Plaintiff indicated it had opposed, was not blocking then, or now, any EU registration of Plaintiff.

Plaintiff's aggressive opposition tactics in the EU are not going unnoticed by other foreign IP offices, and Plaintiff must now live with the consequences of having disrupted the peaceful co-existence of the parties and their respective fields and businesses, to now setting into motion a host of potential challenges in an effort to combat purported likelihood of confusion when there never was any in the first instance, and where there will not be any in the future (even when and if the Defendants eventually commence their satellite network operations).

In the jurisdiction that this Court *does* have authority over, namely the rights in the US and the US trademark registrations, there is no conflict in the United States Patent and Trademark Office between the Plaintiff's US THEIA marks of its registrations and the Defendants' US THEIA marks of Defendants' applications. Plaintiff holds its registrations, and Defendants' applications are allowed and pending (awaiting Defendants' use of the marks and Defendants' use statement filings). And, as pointed out above, a number of other registrations (of other parties) for THEIA marks, co-exist too.

Because, for at least the above reasons alone, Plaintiff cannot establish a likelihood of irreparable harm, the preliminary injunction motion must be denied.

The other prongs also are not met, and for additional reasons, Plaintiff's motion must be denied.

## 2. Plaintiff Cannot Establish a Likelihood of Success on the Merits.

"To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark . . . must show that a defendant's use of a similar mark for its goods `causes a likelihood of confusion.'" <u>Arrowpoint Capital Corp.</u>,

793 F.3d 313 at 319 (emphasis supplied).

### a. There is No Likelihood of Confusion

The confusion analysis is determined by application of the Lapp factors. In determining whether there is a likelihood of confusion in the Third Circuit, the following non-exhaustive list of the factors are considered: (1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicating the care and attention one expects would be given when making a purchase; (4) the length of time the alleged infringer has used the mark without evidence of actual confusion arising; (5) the intent of the alleged infringer in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels; (8) the extent to which the target markets are the same; (9) the perceived relationship of the goods, whether because of their near-identity, similarity of function, or other factors; and (10) other facts suggesting that the prior owner might be expected to expand into the alleged infringer's market. See Arrowpoint Capital Corp. v. Arrowpoint Asset Management, LLC, 793 F.3d 313, 318 (3d Cir. 2015) citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983).

The factors pertinent to the present case are:

### Factor 1: There Are Differences Between the Marks

Plaintiff Theia Technologies uses its mark as it has presented, in a stylized font format with the additional term "Technologies" with "Theia" in a rectangular block, and with a larger, pronounced dot over the lower case letter "i".  Plaintiff refers to this usage in its pleadings (Complaint ¶ 17).



Plaintiff appears to make its products overseas as is shown by a box containing the product indicating a source in Japan on the box, and with a stamping on the lens indicating that it is "made in Indonesia". (Bonini Decl. Ex. 30). On the box packaging, Plaintiff uses its THEIA TECHNOLOGIES mark and on the lens inside the box, Plaintiff uses its stylized mark format with an upper case letter "T" and the enlarged dot over the lower case "i".



(Id.)

Plaintiff's THEIA mark of its alleged incontestable registration is limited to lenses: Photographic devices, namely, lenses; optics, namely, lenses. (US Reg. No. 3473019)[9]

(Complaint ¶ 14)

---

[9] Plaintiff claims its registrations are incontestable, but Plaintiff's alleged incontestability of its registration is limited to the goods and services of the registration, and not products or services that are not recited therein. See 15 U.S.C. § 1057(b) ("[a] certificate of registration of a mark ... shall be prima facie evidence of ... the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.") Furthermore, the registrations are not incontestable for all purposes. See 15 U.S.C. §§ 1065, 1064.

Plaintiff's second registration, also for the mark THEIA, is for: downloadable mobile applications for calculating image resolution and simulating pictures; downloadable software in the nature of a mobile application for use in association with closed circuit TV systems for security and surveillance; lens calculating software for analyzing data to calculate resolution. (Complaint ¶ 14)

Plaintiff's registered marks specify lenses, and software for operating the lenses.

Furthermore, Plaintiff's use demonstrates a different mark THEIA TECHNOLOGIES. Plaintiff's mark THEIA TECHNOLOGIES appears on the lens box (see above), and on its web site. Thus Plaintiff's uses of THEIA TECHNOLOGIES further dispels any likely confusion, particularly when THEIA TECHNOLOGIES appears on Plaintiff's packaging (i.e., boxes) and its web site pages. In fact, Plaintiff's alleged "marketing" expenditures which Plaintiff asserts includes advertising, is not broken down as to what the specific dollar amounts of the advertising pertain, and whether the alleged "marketing" expenditures advertise a mark or something else, and whether it is for the mark THEIA TECHNOLOGIES. (Doc. No. 2, Gohman Decl. ¶ 11) Plaintiff has not indicated how much of this advertising actually goes to the mark THEIA and to associate it with the alleged products of Plaintiff, or how much goes to associate THEIA TECHNOLOGIES, or something else. Given the Plaintiff's web site and its product packaging, the Plaintiff appears to be using THEIA TECHNOLOGIES. Theia by itself appears on Plaintiff's lenses in the stylized format (with the upper case "T" and enlarged dot over the "i", but the packaging (box) and Plaintiff's web site clearly use a different mark, "Theia Technologies".

Defendants use THEIA on their website in a stylized font format, that appears in all upper case letters, as demonstrated in the documents Plaintiff has provided (which include its

appearance on Defendant Theia Group's web site); and in its communication to the FCC. The font styling appears on the website, and in the stylized T THEIA and Earth Logo marks:



Plaintiff's asserted marks include THEIA word marks (for lenses and lens operating software) and also include an alleged unregistered stylized font type THEIA TECHNOLOGIES mark comprised of a rectangle on which "THEIA" appears in a styled font, with the initial capital letter "T" and the enlarged dot over the "i". Plaintiff also refers to a mark consisting of a blue ring on the end of a lens.

Defendants do not use "Theia Technologies", nor do they make a lens with a blue ring on it or use the stylized font with the upper case "T" and large dot over the letter "i". Defendants use the Theia Earth Logo mark and the stylized font in all upper case letters.

**Factor 2: Strength of the Plaintiff's Asserted Marks**

Plaintiff's mark is weak, not strong. "Marks may be classified according to a spectrum of five categories originally formulated by Judge Friendly, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, or fanciful. [ ] The other relevant measurement, commercial strength, is based on 'actual marketplace recognition, and thus advertising expenditures can transform a suggestive mark into a strong mark.' " MarketQuest Grp. Inc. v. BIC Corp., 11-cv-118, at *10 (November 7, 2011, S.D. Cal. 2011) (citations omitted) citing Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt. Inc., 618 F.3d 1025 (9th Cir. 2010).

In the present case, THEIA is not an arbitrary or fanciful mark.  Unlike marks such as XEROX which is fanciful and a made up term, or a mark that is arbitrary, such as APPLE for computers, "Theia" has a defined meaning.  While THEIA is not descriptive of the goods and services, neither is it a strong mark. "Theia" bears a relationship to the goods and services, as "Theia" is the name of the Titan goddess of sight (*thea*) and the shining ether of the bright, blue sky (*aithre*).[10]  The consumers therefore expect a connection with sight or the sky, and so the mark itself, Theia, unlike an arbitrary mark such as XEROX (which has no meaning or suggestion), is a weaker mark.[11]

Further demonstrating that the mark Theia is a weak mark are the number of others (third parties) that use THEIA in connection with their goods and services.  There is not merely a single company using the mark but a number of others, including companies other than the Plaintiff and Defendant in this case, which hold registrations for a THEIA mark, including THEIA marks that relate to imaging and/or computer software.

A number of Theia marks appear in the US Trademark Records of third parties:

---

[10] Titan, in Greek mythology, any of the children of Uranus (Heaven) and Gaea (Earth) and their descendants. According to Hesiod's Theogony, there were 12 original Titans: the brothers Oceanus, Coeus, Crius, Hyperion, Iapetus, and Cronus and the sisters Thea, Rhea, Themis, Mnemosyne, Phoebe, and Tethys. (https://www.britannica.com/topic/Titan-Greek-mythology); and see the Theoi Project (https://www.theoi.com/Titan/TitanisTheia.html); and thefreedictionary.com

[11] Furthermore, Plaintiff's alleged incontestability of its registration is limited to the goods and services of the registration, and not products or services that are not recited therein. See 15 U.S. Code §§ 1057(b) ("[a] certificate of registration of a mark ... shall be prima facie evidence of ... the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.")  The registration is not incontestable for all purposes. See 15 U.S. Code §§ 1065, 1064.

| MARK | Goods/services | STATUS | Owner | Registration Number |
|------|----------------|--------|-------|---------------------|
| THEIA RT | computer software for creating computer-generated images | Registered | Optis | 4,266,281 |
| THEIA | Computer software that integrates with existing business management intelligence software to improve navigation and user interface; Computer software that provides real-time, integrated business management intelligence by presenting information from various databases in an easy-to understand user interface; Computer application software for personal computers or servers, namely, software to streamline and simplify use of business intelligence software; Computer software to manage, analyze, retrieve, monitor, maintain, report on, structure, model, forecast, present and display data and information from various databases. | Registered | Motio, Inc. | 5,200,801 |
| THEIA LENS | Downloadable computer software that integrates with existing business management intelligence software to improve navigation and user interface; Downloadable computer software that provides real-time, integrated business management intelligence by presenting information from various databases in an easy-to-understand user interface; Downloadable computer application software for personal computers or servers, namely, software to streamline and simplify use of business intelligence software; Downloadable computer software to manage, analyze, retrieve, monitor, maintain, report on, structure, model, forecast, present and display data and information from various databases | Allowed | Motio, Inc. | (Approved Application Pending - 88/401,231) |
| THEIA | Computer software for use in ophthalmic testing; and | Allowed | Maculogix, Inc. | (Approved Application Pending - 88/190,515) |
| | IC 042. US 100 101. G & S: Software as a Service (SAAS) featuring computer software for use in ophthalmic testing | | | |
| THEIA360 | business data analysis related to medical provider referral patterns and medical provider efficacy; collection and analysis of quality metric data for a network of health care providers for business purposes in the field of medical provider referral patterns and medical provider efficacy; business consulting services in the field of medical provider patterns and medical provider efficacy; providing business reports in the field of medical provider patterns and medical provider efficacy. FIRST USE: 20170518. FIRST USE IN COMMERCE: 20170518; and | Registered | TechSolve, Inc. | 5,664,052 |
| | Cloud computing featuring software for use in analysis and analytics of medical provider referral patterns and medical provider efficacy; providing a website featuring on-line non-downloadable software that enables users to analyze medical provider referral patterns and medical provider efficacy; data mining services in the field of medical provider referral patterns and medical provider efficacy. FIRST USE: 20170518. FIRST USE IN COMMERCE: 20170518 | | | |

| | | | | |
|---|---|---|---|---|
| THEIA VAULT | -cloud computing featuring software for use in collecting, organizing, managing, storing, updating, and providing access to personal information and documents, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, healthcare directives, healthcare consents, and HIPAA authorization forms. FIRST USE: 20161214. FIRST USE IN COMMERCE: 20161214 | Registered | Theia Healthcare, LLC | 5,383,666 |
| THEIA EMERGENCY RESPONSE SYSTEM | C 035. US 100 101 102. G & S: estate management, namely, assistance in the collection and organization of personal vital documents and financial records, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, advance directives, healthcare consents, and HIPAA authorization forms, in conjunction with instructions for handling of such documents by others, including executors and attorneys, upon death or when otherwise necessary. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | Registered | Theia Healthcare, LLC | 5,383,665 |
| | IC 039. US 100 105. G & S: archival services, namely, collection and storage of records and documents in the nature of personal documents and information, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, advance directives, healthcare consents, and HIPAA authorization forms. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |
| | IC 042. US 100 101. G & S: cloud computing featuring **software** for use in collecting, organizing, managing, storing, updating, and providing access to personal information and documents, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, healthcare directives, healthcare consents, and HIPAA authorization forms; electronic storage of files and documents in the nature of personal documents and information, including emergency contacts, personal identification, funeral wishes, wills and other legal documents, insurance documents and information, medication lists, advance directives, healthcare consents, and HIPAA authorization forms. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |
| | IC 044. US 100 101. G & S: consulting in the field of geriatric health care management. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |
| | IC 045. US 100 101. G & S: in-home support services to senior persons, namely, geriatric care management services in the nature of the coordination of necessary services and personal care for older individuals; personal concierge services for others comprising making requested personal arrangements and reservations, running errands, and providing customer specific information to meet individual needs; providing non-medical personal assistant services for others in the nature of planning, organizing, coordinating, arranging, and assisting individuals to perform daily tasks; providing patient advocate services in the field of geriatric care; consulting in the field of geriatric care management in the nature of consulting in the coordination of necessary services and personal care for older individuals; geriatric care management services in the nature of strategic planning for the coordination of necessary services and personal care for older individuals. FIRST USE: 20160300. FIRST USE IN COMMERCE: 20160300 | | | |

One readily sees that the mark THEIA RT is registered to Optis for use with computer software that generates images. So consumers for Plaintiff and Defendants' respective products and services already must distinguish their purchases from other Theia imaging software. But there are more. There is THEIA registered for software, inter alia, for business management intelligence, and software to manage, analyze, retrieve, monitor, maintain, report on, structure, model, forecast, present and display data and information from various databases.

In addition, there is THEIA LENS, a mark appearing in an application that is approved by the USPTO. Although Plaintiff attaches images of its lens to the pleadings, and its lenses appear above, THEIA LENS is another use of Theia that consumers also will encounter in the marketplace, and that US Registration for THEIA LENS also is for software (business management and intelligence).

Another third party mark THEIA is registered for computer software, and this relates to sight, as it involves ophthalmic testing, and involves software as a service, requiring customers to access THEIA software on line, involving efforts already being undertake on the parts of consumers to distinguish between THEIA software being marketed in connection with that mark or brand.

THEIA 360 is yet another Registered mark for data analysis and handling, and relates to medical providers, and represents an additional THEIA mark in the marketplace. The THEIA 360 mark is also registered for software and may be accessed through a web site, presenting another potential encounter of the mark THEIA.

There is the Registered mark THEIA VAULT for cloud computing featuring software for managing access to personal information. There also is a mark THEIA EMERGENCY

RESPONSE SYSTEM for, inter alia, storing and managing personal documents and information for emergency situations.

There are a number of THEIA marks of different parties that have co-existed in the marketplace.  Consumers already have to discern the difference when they see THEIA.  In fact, Plaintiff operating in a marketplace where other THEIA marks are also used, already addresses this by Plaintiff's use of "Theia Technologies" on its web site and on its product packaging.

The mark therefore is weak, as unlike a mark like XEROX which owns the XEROX registrations, and is not a term used as a mark by others, THEIA is at least registered and used by a number of different parties.  "Suggestive or arbitrary marks may, in fact, be 'weak' marks, particularly if they are used in connection with a number of different products." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 222 (3d Cir. 2000); see also Citizens In. Grp. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 123 (3d Cir. 2004) ("[A]s a general rule, widespread use of even a distinctive mark may weaken the mark."); One Indus., LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154, 1164 (9th Cir. 2009) ("In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd.")

The strength of the mark factor (factor 2) favors the Defendants.

**Factor 3: The Price Of The Goods And Other Factors Indicating The Care And Attention One Expects Would Be Given When Making A Purchase**

In the present case, consumers would give the utmost care and attention in making a purchase of the respective products or services of the parties.  First, Plaintiff provides lenses, and that is a specific product itself.  Plaintiff's lenses and related software are designed for particular

applications, and one would expect a purchaser to be discriminating in the type and properties of the lens.

Defendants' satellite system and data analysis services and products would be purchased by consumers making very informed and deliberate choices about what they are going to purchase. Defendants' products and services are expensive and highly specialized for their purpose.

> No customer is buying an ATM or a point-of-sale machine on a whim. These are complicated and expensive pieces of equipment sold to specific customers. There are few players in the market with Diebold, a fact that greatly lessens the likelihood of confusion. Similarly, Vynamic's services are largely targeted at a specific market segment. Vynamic's customers are also mostly sophisticated, know the services that they are seeking from Vynamic, and are unlikely to be confused in securing those services.

Vynamic, LLC v. Diebold Nixdorf, Inc., 2019 U.S. Dist. LEXIS 101661; 2019 U.S.P.Q.2D 224293 (ED Pa. 2019)

Similar to what this Court already has observed in the Diebold Nixdorf case, no customer is purchasing Defendant's satellite equipment and services on a whim, and not without very careful consideration. Additionally, Defendants' satellite network and services involve costs that may well exceed the cost of an ATM. Plaintiff's products, though not competing with those of Defendants, also are carefully considered when consumers purchase them.

**Factor 4: The Length Of Time The Alleged Infringer Has Used The Mark Without Evidence Of Actual Confusion Arising; and**

**Factor 6: Evidence of Actual Confusion**

There is no evidence of actual confusion. In the first place, Defendants have not launches their satellite network and therefore are not providing the satellite network and data analytics

services and products. Defendant's operation of its web site or use of its mark in a promotional video, also has not generated any incidents of actual confusion, nor have Defendants' activities before the FCC involving the approval of its satellite network system.

Moreover, there is no evidence that there is any confusion between the Plaintiff and Defendants, or their respective products.

**Factor 5: The Intent Of The Alleged Infringer In Adopting The Mark**

In the present case, Defendants applied to register their THEIA marks with goods and services that relate to satellite systems and related usage. Defendants proceeded with the trademark registrations, and the USPTO examined and approved the registrations, over the existing THEIA registrations already of record in the USPTO (including Plaintiff's asserted registrations and marks). Defendants also registered their THEIA marks in the EU and those registrations were also approved (but they are being opposed by Plaintiff).

**Factor 7: Whether The Goods Are Marketed Through The Same Channels**

Defendants' products and services are sold directly to the purchaser, and the purchaser knows that it is Defendant. In contrast to Plaintiff's products are sold through distributors and at retail. (See Doc. No. 2, Gohman Decl. ¶ 8 and Ex. 2, p. 6; and see Bonini Decl. Ex. Exhibit 21). Defendants do not sell products or services through distributors or at retail. The channels are different.

As pointed out, Defendants' satellite system and is the type of service and product that would be marketed directly to sovereign nations and industrial entities, whereas Plaintiff's products (namely, lenses) are marketed for use with cameras and closed circuit surveillance systems. Plaintiff contends that the channels are the same because both parties use the Internet "to advertise and market their goods to consumers". That is not sufficient, but it does point to a

distinction, which is that Plaintiff products, such as its lenses, can be purchased directly through the internet. (See Bonini Decl. Ex. 21, and Ex. 30) However, Plaintiff has submitted Defendants' web site pages, and there is no evidence of Defendants offering to sell any products or services that that may be purchased through the web site. Rather, as Plaintiff admits and acknowledges, *a further inquiry must be made*, directly with Defendants. Defendant's products are not available to the general public, but rather are restricted to qualified parties. Public access of an Internet site is not the same as offering wares or services to the general public.

Same channel, does not mean because both parties use the Internet to showcase a product or service that they are therefore marketing through the same channels.

Plaintiff's products may be sold through on-line retailers as Plaintiff has retail distribution for its products. (Id.), and Plaintiff also advertises customized lenses (see Doc. No. 2, Gohman Decl. ¶ 8 and Ex. 2, p. 5), which on the material submitted by Plaintiff uses the mark THEIA TECHNOLOGIES. Plaintiff's products are sold through on-line retailers, such as Amazon.com. (Bonini Decl. Ex. Exhibit 21)

Defendants do not sell products that one may obtain through retail channels, and Defendants have no distributors; nor are Defendants' satellite related services and system the type that may be provided through a retail distribution network. Defendants' satellite network and data analytics are not expected to be sold on Amazon.com, nor are they the types of products or services that would even be sold on Amazon.com when Defendants begin operating their satellite network (TSN). Plaintiff even points out that Defendants' websites invite inquiries. There are no products listed on Defendants' websites for which to inquire about. There is information, and data analysis discussed, and that typically involves a high cost, and sovereign

nations or large industrial entities are the likely consumers for the Theia satellite related products and services.

Moreover, Defendants' website seeks only "qualified" interested parties, and not the general public.

Defendants' satellite network products and services would be marketed through in-person conferences, by appointments and involve planning with Defendants and their potential customers. Unlike Plaintiff and its products, consumers, even those viewing Defendants' website, would not be confused into believing that somehow it is Plaintiff or sponsored by Plaintiff. Because of the high level of sophistication for the Defendants' satellite network and the high costs involved, the channels would need to be different. In addition, Plaintiff's lenses are not inexpensive products, and even though costing a few hundred dollars, consumers will make a careful purchase when considering the product.

**Factor 8: The Extent To Which The Target Markets Are The Same**

The target markets of the parties goods and services are vastly different. Defendants' products and services are target direct sales to sovereign nations and industrial entities, and, unlike Plaintiff's products, cannot be purchased "off the shelf". As Plaintiff even observes, Defendants' web site indicates that it limits further information that it would provide to "Qualified, Interested Parties". (Doc. No. 1, Complaint ¶ 14). Defendants' satellite system and data analytics are the type of products and services customized and specific for a customer. These types of purchasers are not the Plaintiff's target.

Plaintiff provides products that may be stock products and marketed and sold through a distributor network. Plaintiff provides web cams, security cameras. Plaintiff discusses that its products are "used on" things, such as high altitude balloons and in space and weather

monitoring, security and surveillance applications. (Doc. 2, Pl. Motion, p. 12.). Even if Plaintiff's lenses are used on those items, as Plaintiff asserts, they are parts used in an assembly operation, and are purchased by one constructing the apparatus on which the lens is used. Plaintiff is not providing products or services that would compete with Defendants' satellite network, or the services and data products.

Plaintiff, on the other hand, sells its products through a network of distributors and resellers, and further relies on the distributor network to provide technical support.

The target markets are not the same.

**Factor 9: the perceived relationship of the goods, whether because of their near-identity, similarity of function, or other factors**

Defendants' website offers a glimpse into the Defendants' satellite network and the data analytics capabilities. It is not something that a lens or any other part, even if used on a satellite for imaging (as Plaintiff's president asserts must be the case). Defendants' products and services relate to a satellite network system.

In fact, it is telling that there are separate identities and not similarities, as Plaintiff's claims that others, and not Plaintiff, are providing the spacecrafts, balloons, and products, in which the Plaintiff's lenses are procured for use. This demonstrates that the producers of spacecrafts, balloons, and other products, do not also make lenses, but rather are different companies. Consumers for Plaintiff's products already know that Plaintiff is not in the field of producing spacecrafts (even if they know Plaintiff's lenses are used on a drone, for example).

After all, Theia Group's US trademark applications list "satellite hardware" and services that are specified to involve the "operation and use of satellite equipment":

IC 009. US 021 023 026 036 038. G & S: *Satellite hardware*, namely, computer hardware, satellite receivers, satellite dishes, satellite transceivers, electronic data sensors, remote sensors for use in measuring and monitoring activity taking place on, above and below the earth's surface, and associated

software for controlling the aforementioned hardware for collecting, processing, analyzing and reporting data, and backhauling data from another orbiting constellation of satellites, which replaces some or all of the need for the constellation satellites to downlink directly to earth on their own; modules, namely, computer memory, and integrated circuit modules **for backhauling data from another orbiting constellation of satellites**, where the aforementioned replaces some or all of the need for the constellation satellites to downlink directly to earth on their own

IC 042. US 100 101. G & S: Remote electronic monitoring via **operation and use of satellite equipment** using computers and sensors for the analysis of data via visible and non-visible electromagnetic wavelengths, such that materially all of the available wavelengths and/or spectrum necessary to perform subsequent analytics tasks are obtained at once, and/or at a rate faster than the underlying activity rate of the industry, activity or process being observed; spectral analysis of data via visible and non-visible electromagnetic wavelengths and data analysis for commercial, agricultural, geologic, energy and industrial fields, and for monitoring and identifying and differentiating activity, objects and/or living beings, taking place on, above and/or below the earth's surface, especially where the quality of the analytics are sufficient to replace human decision making

Plaintiff has not identified any plans to make, produce or operate satellites. Plaintiff has not provided any evidence of any government approvals for operation of satellite networks.

In addition, Plaintiff's evidence further establishes major distinctions in the reality of why a likelihood of confusion cannot exist, since Plaintiff recognizes that to conduct operations that Defendants propose and plan through Defendants' Theia Satellite Network (TSN), that large sums of capital are required, and Plaintiff's president claims to have only made $77 million dollars of sales over about a decade. (Doc. No. 2, Gohman Dec. par. 11)   The basis of Plaintiff's accusations of Defendants being able to dwarf the Plaintiff and its business, is a clear recognition why consumers for the respective products will not consider a satellite company which may spend billions to build and operate a satellite network to not be a company of the size Plaintiff claims to be. (Defendants address below why Plaintiff's reverse confusion argument also fails.)

**b.      There is No Reverse Confusion**

Plaintiff has touted Defendants Theia Group's large plans as potentially dwarfing Plaintiff and therefore claiming the existence of reverse confusion.  But this is not a case for reverse confusion.

Plaintiff's assertions actually portend against any reverse confusion. Plaintiff cites to a purported transaction involving Defendants Theia Group's satellites which references billions of dollars and pinpoints the identity of the company specifically as Theia Group of Philadelphia. Plaintiff's evidence demonstrates that no one would think that Plaintiff would be involved in a transaction worth billions.[12] We are not sure how many lenses that would be, but most consumers of Defendants' satellite system and those of Plaintiff's products would readily possess the level of sophistication required to readily ascertain that each company is not the other. (Plaintiff does make a good case for why a bond requirement for any preliminary injunction that it seeks must have an extremely high amount - as Plaintiff's own evidence demonstrates, the potential for loss may be billions.)

In situations where one party's products are at an extremely high level, there is no reverse confusion, nor is there likely confusion. Diebold Nixdorf, Inc., 2019 U.S. Dist. LEXIS 101661. The plaintiff and defendant were using identical marks ("VYNAMIC), defendant for the sale of software for ATM machines and point of sale machines, and plaintiff for management consulting services in the healthcare field. The Court determined that the level of cost for the product and sophistication of the consumers was at a high level and that no consumer would ever confuse who it was purchasing from, and there was no likelihood of confusion.

In the present case, there is no evidence that Defendants have overwhelmed the marketplace. The strength of the mark, as was determined in Diebold Nixdorf, even where a mark at issue was a fanciful, made-up term (which is not the case here), was lacking because the defendant, which had 4.6 billion dollars in sales, had not overwhelmed the marketplace. Diebold

---

[12] The reference is not from an official press release, bur appears to be from leaked information, so the reference to billions may be Thai Baht (tens of millions of US $) or US dollars (billions).

<u>Nixdorf, Inc.</u>, 2019 U.S. Dist. LEXIS 101661 *2, 7.  To the contrary, Plaintiff's evidence

establishes that Defendants are an "unknown company".  (See Doc. No. 2, Homen Decl. Ex. 20)

 Accordingly, there is no likelihood of reverse confusion.

**c. Plaintiff's "Blue Ring" Mark Does not Provide Rights to The Color Blue**

 Furthermore, Plaintiff's registrations for a Blue Ring on a lens is limited to the *ring*

*appearing on the lenses* and with the further limitation that that ring be blue.  Plaintiff has no

evidence that Defendants have made or would make a lens in the first place, let alone use a blue

ring on the front of the lens.

 In <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d 1352, 1354 (9th Cir. 1985) (*en banc*), a

plaintiff's federally registered trademark was limited to *pants* pocket tabs, but its trademark

infringement claim was based on an alleged trademark in *clothing* pocket tabs generally.  The

Ninth Circuit did not permit the plaintiff to rely on the federal registration of pants pocket tabs,

to extend the protection to a pocket tab on garments generally, determining that the registration

constitutes prima facie evidence of a protected interest with respect to the *goods* specified in the

registration only.

 In the present case, it is even worse for Plaintiff, as not only are the registrations limited

to a ring on the lens (noting that Defendants do not even produce lenses), but also, the ring must

be blue.  Plaintiff's registration even specifies this limitation providing that "[t]he mark consists

of the three-dimensional trade dress of a blue ring in the lens housing of a photographic lens. The

matter shown in broken lines serves to show positioning of the mark and is not claimed as a

feature of the mark." (See the Registration Certificates, Doc. No. 2, Exs. 4 and 5 to Homen

Decl.)  That is very specific, and not facts demonstrate Defendants have ever used or are even

contemplating, or applying to register or use a ring on a lens.

Moreover, the Plaintiff irresponsibly attempts to make a claim on the color "blue" by extending what is a very limited trademark registration. Plaintiff notes that Defendants also use the color blue. Defendants use an Earth logo, and since the Earth is often represented in blue it is not inconceivable that the blue Earth logo would suggest something other than a source indicator. As discussed below, since the mark THEIA has word origins in the Titan goddess of sight, and to some extent the sky (which is blue), it is not uncommon for "Theia" to appear with blue as the third party mark indicated above also uses blue. For example, scientifically, blue light is scattered more in the atmosphere (sky) due to the nitrogen and oxygen molecules.

Also, there are very few trademarks covering a color. Perhaps Owens Corning's use of the color pink for its insulation products is one of the most notable color marks. Plaintiff does not have rights to the color blue, regardless of whether it has a registration. Plaintiff's use of blue is merely a design and not a mark. Plaintiff's attempt to expand the scope of its limited blue lens ring registration to cover Defendants' marks, not only may constitute an improper enforcement use of its Registration, but also demonstrates that the color blue is a mere design and has no significance when used on a lens. See also the blue lens of others, demonstrating that the use is not exclusive and is clearly a design:

blue lenses of others, demonstrating that the use is not exclusive, not even a blue lens ring, and it clearly is a design:





(Bonini Decl. Ex. 17)                (Id.)                           (Bonini Decl. Ex. 18)



10mm FL Blue Series M12 μ-Video™ Imaging Lens

(Bonini Decl. Ex. 16)

In addition, because "Theia" relates to the Titan goddess of sight (and sometimes the sky and heavens), "Theia" has been adopted as a mark for "sight" pertaining products.[13]  (Bonini Decl. Ex. 19 - Titan Definition of "Theia").

Plaintiff's owns a very limited registration for a lens with the color blue, but does not have ownership of the color.

**3.     A Preliminary Injunction Would Work a Hardship for Defendants**

Defendants have demonstrated that there is significant potential for business using their mark, as is demonstrated by Plaintiff's own submissions, containing reports of the Defendant's satellite system and costs of "billions" of dollars and effort to bring it about by the year 2023, and that through a leaked report as Plaintiff knows, sovereign nations (i.e., Thailand) already are considering and have held discussions with the Theia Group Defendants.  (Doc. No. 2, Homen Exs. 20 and 21).  If Defendants are forced to cease use of the mark, changes in their identity may

---

[13] Titan, in Greek mythology, any of the children of Uranus (Heaven) and Gaea (Earth) and their descendants. According to Hesiod's Theogony, there were 12 original Titans: the brothers Oceanus, Coeus, Crius, Hyperion, Iapetus, and Cronus and the sisters Thea, Rhea, Themis, Mnemosyne, Phoebe, and Tethys. (Bonini Decl. Ex. 20 - https://www.britannica.com/topic/Titan-Greek-mythology); and see the Theoi Project  (Bonini Decl. Ex. 19 - https://www.theoi.com/Titan/TitanisTheia.html)

involve time delays of materials and significant business opportunities may be threatened, causing delays that may make the 2023 target date a sure impossibility.

Although the Court would have to impose a bond for any preliminary relief, such an amount is beyond any compensation that could make Defendants whole. In particular, Plaintiffs, recognizing this issue, even have complained about having to put up a bond. (See Doc. No. 2, Gohman Decl. ¶ 13)

**4.      The Public Interest Is Not Served By an Injunction**

The public interest would not be served by the issuance of a preliminary injunction here, where the parties do not compete with each other, there is no likelihood of confusion between the marks with the respective uses, and where Plaintiff unlikely to prevail on the merits. Plaintiff claims irreparable harm, but in reality, Plaintiff's own submissions indicate that Defendants Theia Group satellites (TSN) will not launch until after this civil action is concluded. In addition, Plaintiff's harm appears to focus also on foreign trademark registrations which are beyond the jurisdiction of this Court. Moreover, the Plaintiff's products do not compete with the products or services to be offered by Defendants. Plaintiff does not provide satellite services and does not provide satellite based information packages based on real-time global looks at the entire earth all at once. Nor has Plaintiff even provided evidence that it intends to operate a constellation of satellites.

Consequently, the public interest does not favor a preliminary injunction here.

**B.      A Substantial Injunction Bond is Required**

Pursuant to Federal Rule of Civil Procedure 65(c), a district court must fix a bond whenever it grants a preliminary injunction "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained" and, furthermore the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (Fed.R.Civ.P. 65(c)). "The purpose of the bond is to provide security for any damages resulting from an improvidently granted injunction." Rauch Indus., Inc. v. Radko, No. 3:07-CV-197C, 2007 WL 3124647, at *8 (W.D.N.C. Oct. 25, 2007). "The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999). The district court has discretion in fixing the amount for the security bond. Id.

However, a court must be mindful that "an understated bond could cause irreparable harm on the ground that 'the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.'" Lab. Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 466 (M.D.N.C. 2015) (quoting Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)). Therefore, district judges are "guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for the harm it suffers as a result of an improvidently issued injunction." Hoechst, 174 F.3d at 423 n.3. See also Covidien Sales LLC v. Ethicon Endo-Surgery, Inc., No. 3:14-cv-917, 2014 WL 5242872 (D. Conn. Oct. 15, 2014) (court imposing bond of $5 million to cover a two-month period of time, where moving party proposed $3 million dollar bond); and see OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., No. 2:14-CV-00085 (E.D. Wash. December 19, 2018)(court in trademark infringement action raising bond from $1.2 million to $3 million).

Given that the Plaintiff's own submissions speak in terms of billions to be spent on Defendants' satellite systems, the bond requirement in this case should be even much higher than the bond in the cited cases.

CONCLUSION

For the above reasons, the Plaintiff has not and cannot meet the rigorous standards for a preliminary injunction.  Plaintiff's alleged harm involves issues of foreign registration that beyond the jurisdiction of the this Court, there is no imminent harm demonstrated that warrants the  extraordinary remedy of an injunction only speculation based on what Defendants might do in the future, and the merits of the case do not establish that Defendants' use of its marks for satellite related products and services would be likely to cause confusion with Plaintiff's marks for its lenses and related software.

Respectfully,

BONINI IP LAW, LLC

Date: January 29, 2020          BY: ___s/Frank J. Bonini, Jr._____
                                Frank J. Bonini, Jr., Esquire (59394)
                                150 N. Radnor Chester Rd.
                                Suite F200
                                Radnor, PA 19087
                                Tel: 484-382-3060
                                fbonini@boninilaw.com

                                GALLAGHER LAW PC

                                BY: ___s/James Hickey_____
                                James Hickey, Esquire
                                Gallagher Law PC
                                1600 Market Street
                                Suite 1320

Philadelphia, PA 19103
215-963-1555
james@gallagher-law.com

*Attorneys for Defendants*
***THEIA GROUP, INCORPORATED, and***
***THEIA HOLDINGS A, INC.***


## CERTIFICATE OF SERVICE

I, JAMES HICKEY, ESQUIRE, attorney for Defendants Theia Group, Incorporated and Theia Holdings A, Inc. hereby certify that I filed the within Memorandum Of Defendants Theia Group, Incorporated And Theia Holdings A, Inc. In Opposition To Plaintiff Theia Technologies, LLC's Motion For Preliminary Injunction electronically and it is now available for viewing and downloading from the EFC system for the following:

Diane Siegel Danoff. Esquire
Luke M. Reilly, Esquire
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Hillary A. Brooks, Enquire
Delfina S. Homen
BROOKS QUINN, LLC
6513 132nd Avenue NE # 378
Kirkland, WA 98033



Gallagher Law PC


By:   s/James Hickey
      James Hickey, Esquire
      Attorney for Defendants
      Theia Group, Incorporated
      Theia Holdings A, Inc.


Date:  January 29, 2020