### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THEIA TECHNOLOGIES LLC,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THEIA GROUP, INC, *et al.*,** | : | |
| *Defendants* | : | **No. 20-97** |

### MEMORANDUM

PRATTER, J.                                                           JANUARY 27th, 2021

"Space: the final frontier."[1]  "To infinity and beyond."[2]  Our fascination with space is grounded in part by a desire to understand our own world.  Indeed, both parties in this trademark dispute appear to have that goal and that may be why both parties invoke "Theia"—the Titan goddess of sight and prophesy—as part of their names.

But even celestial pursuits must give way to earthly constraints, including the terrestrial bounds imposed by trademark law.

Plaintiff Theia Technologies LLC owns and uses the trademark THEIA for lenses and related software, which are used for a variety of applications, including infrastructure monitoring, traffic monitoring, security and surveillance, machine vision, and the monitoring of ports.  Theia Technologies is currently developing lenses for satellites, and its lenses have been used on spacecraft.  Defendants Theia Group, Inc. and Theia Holdings A, Inc.—collectively referred to as Theia Group—also use a THEIA word mark in connection with a 112-satellite network they plan on launching and operating.  Theia Group markets its network as being capable of spanning the globe to provide data analytics for a variety of uses, including atmospheric sciences, agriculture,

---

[1]     Title Sequence, Star Trek (NBC television broadcast 1966).

[2]     Toy Story (Pixar Animation Studios 1995).

natural resources exploration, insurance, infrastructure protection, and security. It anticipates that it will be the largest, most valuable company in the world in the coming decade.

In response to Theia Group's efforts, Theia Technologies alleges "reverse confusion" trademark infringement and unfair competition under both the Lanham Act, Pub. L. 79-489, 60 Stat. 427, and its common law counterparts.

Both parties have put in orbit several motions.[3] Technologies seeks to enjoin Group from using the THEIA mark or any marks or designations which colorably imitate or are confusingly like the mark THEIA. Group then moved to dismiss the complaint. The parties conducted limited discovery related to the motion for preliminary injunction. The Court held two days of hearings, and the parties submitted findings of fact and conclusions of law. The parties then pursued a second phase of motions practice: Technologies moved to supplement the preliminary injunction record with various exhibits to supplement with its proposed findings of fact and conclusions of law. Group, in turn, moved to strike this evidence, as well as what it contends is newly requested relief first appearing in Technologies' proposed findings of fact and conclusions of law.

The Court denies Group's motion to dismiss and its motion to strike. The Court grants Technologies' motion to supplement the record and grants in part Technologies' motion for a preliminary injunction. The Court grants the relief initially requested by Technologies in its Motion for Preliminary Injunction, denies Technologies' additional request to cancel Group's pending trademarks and its request to enjoin Group from converting its International Registration into a Japanese national registration at this time.

The injunction shall not issue unless and until Technologies posts the bond.

---

[3]     To assist the reader, this Memorandum refers to Plaintiff as "Technologies" and Defendants as "Group."

## BACKGROUND

The facts in this case are set forth in the Court's findings of facts concerning Technologies' motion for preliminary injunction.

Briefly, Technologies has owned its trademark THEIA for lenses and related software in the United States since at least November 2007 and October 2010, respectively. Technologies' THEIA mark appears on lenses used in high altitude drones and balloons, weather monitoring, and surveillance and security applications. Technologies sells its lenses and related software throughout the United States and around the world, including in Asia, the European Union, the Middle East, South America, Australia, Russia, and Eastern Europe. Technologies contends that its ownership of, and prior rights in, THEIA have been public since 2008 and that its use of the THEIA mark has been open and notorious since inception.

Group recently began using THEIA in advertising its 112-satellite network. It markets this network as capable of spanning the globe to deliver "data analytics" to a wide variety of customers in many industries, including atmospheric sciences, agriculture, natural resources exploration, insurance, infrastructure protection, and security. In May 2019, the Federal Communications Commission (FCC) granted in part Group's application for the THEIA satellite network. Group also has two U.S. trademark applications pending, one for the word mark THEIA and another for a THEIA design mark, for goods and services. Group also sought an International Registration under the Madrid Protocol to use the THEIA mark in member countries. Relevant here, Group's Madrid extension of its U.S. trademark application has blocked Technologies' efforts to register the THEIA mark in Japan.

Technologies argues that Group's mark overlaps with the capabilities of its THEIA lenses, optics, and related software. Moreover, it contends that use of the THEIA mark is likely to cause confusion for a variety of reasons, including that the parties' marks are the same, that the parties

3

target similar customers in similar industries, and that the parties market their products and services through similar means. Technologies claims to be especially concerned about harm to its reputation given that the THEIA satellite network has already garnered negative press, including accusations of "spy satellites."

Technologies moved to enjoin Group from using the mark THEIA or any marks or designations which colorably imitate or are confusingly like the mark THEIA. Shortly thereafter, Group moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The parties engaged in limited informal discovery efforts in preparation for the preliminary injunction hearing. The Court conducted a preliminary injunction hearing and heard oral argument on July 15 and 16, 2020. During the hearing, one witness testified on behalf of Theia Technologies and two witnesses appeared on behalf of Group. Various exhibits were also admitted into the record. After the hearing, the Court instructed the parties to submit proposed findings of fact and conclusions of law.

Accompanying its proposal, Technologies also submitted a declaration of its attorney, attaching various exhibits which were not admitted into the record. Technologies frequently cited these exhibits in its proposed findings and conclusions. The Court held a phone conference with the parties to discuss the filing, as well as sealing issues which the Court has since resolved. Technologies then moved to supplement the record with the additional exhibits. In turn, Group moved to strike these exhibits and the relief requested in Technologies' proposed findings and conclusions. Because Technologies requested additional relief in its findings and conclusions to which Group did not have the opportunity to respond, the Court granted the parties yet another round of briefing limited to addressing Technologies' newly requested relief.

## THEIA GROUP'S MOTION TO DISMISS[4]

Group moves to dismiss Technologies' complaint under Rules 12(b)(1) and 12(b)(6). Group contends that the Court lacks subject matter jurisdiction, that the claims are not ripe, and that Technologies fails to state a claim.

### I.     Legal Standards

#### A.   Rule 12(b)(1) Standard

A district court can dismiss for lack of subject matter jurisdiction based on the legal insufficiency of a claim. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408 (3d Cir. 1991). A claim can be dismissed under Rule 12(b)(1), however, "only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Gould Elecs. Inc v. United States*, 220 F.3d 169, 178 (3d Cir. 2000) (quoting *Kehr Packages*, 926 F.2d at 1409). In other words, dismissal is appropriate where the claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir. 1987) (quoting *Oneida Indian Nation v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)).

Rule 12(b)(1) challenges to subject matter jurisdiction may be either facial or factual. A facial attack does not dispute the facts as alleged in the complaint and requires a court to "consider the allegations of the complaint as true." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). So,

---

[4]      The Court addresses Group's jurisdictional challenge, as well as its arguments in its motion to dismiss, before considering the motions related to granting Technologies preliminary injunctive relief. *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936) (requiring the district court to "inquire as to its jurisdiction before considering the merits of the prayer for preliminary injunction").

the court applies the same standard of review here as when considering a motion to dismiss under Rule 12(b)(6). *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

By contrast, a factual attack challenges the allegations underlying the complaint's assertion of jurisdiction, "either through the filing of an answer or 'otherwise present[ing] competing facts.'"[5] *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). When assessing a factual challenge, the court may consider evidence outside the pleadings. *Aichele*, 757 F.3d at 358 (internal quotation marks omitted). Hence, the non-moving party does not have the same procedural safeguards that it enjoys under Rule 12(b)(6). Instead, the plaintiff has the burden of proof on a factual challenge to demonstrate that jurisdiction does in fact exist. *Mortensen*, 549 F.2d at 891.

### B. Rule 12(b)(6) Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the plaintiff must give fair notice of the claim and the grounds, which requires the plaintiff to provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Factual allegations "must be enough to raise a right to relief above the speculative level." *Id.*

---

[5]  Technologies argues that Group's factual attack is improper because such an attack can only be made after filing an answer. Such a position, however, overlooks that a defendant may either file an answer or "otherwise present[] competing facts.'" *Davis*, 824 F.3d at 346 (citation omitted); *Aichele*, 757 F.3d at 358 (district court erred by construing motion as a factual attack before defendant had filed any answer or otherwise presented competing facts). Group contends that it has presented otherwise competing facts in the declarations it submitted with its motion. Because the facts set forth in the declarations all essentially, but merely, reiterate the facts Technologies pled in its complaint and reinforced in moving papers for the preliminary injunction, it is not clear to the Court how Group is presenting *competing* facts. For the sake of thoroughness, the Court will consider Group's attack as both facial and factual.

6

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"). The Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted). Nor will the Court accept legal conclusions. If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## II.     Discussion

Group asserts both a facial and factual attack under Rule 12(b)(1). Group's facial challenge fails because the complaint does allege plausible claims for trademark infringement and unfair competition under the Lanham Act, and common law trademark infringement and unfair competition. Group's failure-to-state-a-claim challenge fails for the same reasons. In order to prevail on all of these claims, Technologies "must establish that '(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion.'" *Maduka v. Tropical Nats., Ltd.*, 409 F. Supp. 3d

7

337, 352 (E.D. Pa. 2019) (quoting *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000)).

As a preliminary note, the facts alleged in Technologies' complaint, as well as the "competing facts" set forth by Group largely track the findings of fact set forth in detail as part of the Court's discussion of the preliminary injunction.[6]

As discussed *infra*, the first two elements, validity and legal protectability, are established where the marks at issue are federally registered and "incontestable" under the Lanham Act. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Here, Technologies' claims of ownership are satisfied based on its incontestable U.S. Trademark Reg. No. 3,473,019 for the mark THEIA for lenses, and the U.S. Trademark Reg. No. 4,834,647 for the mark THEIA for related software.[7]

Technologies must also allege facts that would support a finding that Group's use of the THEIA mark causes a likelihood of confusion. The Court finds that Technologies makes such a showing to satisfy the third element. Both parties contend that their products have applications in the security and satellite space. For example, Technologies alleges that it uses its THEIA mark on its lens technology and related software which have multiple applications, "including high altitude drones and balloons, space and weather monitoring, security, and surveillance applications." Compl. ¶ 12 (Doc. No. 1). It pled that its lens technology is currently used on a spacecraft flown by the Japanese Space Agency JAXA, that it currently has a lens used by NASA on its Global Hawk Drone to monitor weather events, and that its lenses can be used on satellites. Technologies

---

[6]     The findings of fact also include references to additional evidence presented during the hearing as well as certain of Technologies' supplemental exhibits submitted after the hearing.

[7]     The Court takes judicial notice that, while the parties were engaged in briefing for the preliminary injunction, the '647 registration passed the five-year mark of consecutive use, necessary for a mark to be declared incontestable.

alleges that its lens technology is used in various industries, "including the transportation industry; the security industry; and the science industry for wildlife monitoring, coral reef monitoring, and unmanned aerial vehicles." *Id.* ¶ 13. According to the complaint, Group uses an infringing THEIA mark on its website to market its 112-satellite network which will be able to "capture visible, non-visible, and radar remote sensing imagery and data over the whole earth at once, at ground resolutions as small as 25 centimeters." *Id.* ¶¶ 22, 27. And, Group's website advertises that, after the satellite network is fully deployed, its applications will include "agriculture, first responder and emergency services, infrastructure, insurance, compliance and risk, nation-state security, mapping and transportation, property registry, and natural resources." *Id.* ¶ 28. Such allegations set forth a plausible narrative that Group's use of its THEIA mark may cause a likelihood of confusion.

These allegations, if taken as true, demonstrate that Technologies' claims are certainly not insubstantial, implausible, or otherwise devoid of merit. To the contrary, Technologies does state a claim. So, Group's Rule 12(b)(6) challenge likewise fails. And, these allegations are *further* supported by the "otherwise competing evidence" that Group submitted in support of its motion to dismiss, meaning that Group's "factual attack" too fails.

Presumably in support of both its asserted facial and factual attack, Group also advances four principle arguments as to why it believes the Court lacks subject matter jurisdiction: (1) the Court lacks jurisdiction over foreign trademark registrations so they cannot give rise to a cause of action; (2) Group's intent-to-use U.S. trademark applications cannot support a trademark infringement claim; (3) the satellites have yet to be manufactured and launched; and (4) a recitation

of a merits argument concerning the likelihood of confusion that Group raised in its opposition to Technologies' motion for preliminary injunction.[8]

*First*, the mere fact of a foreign registration may not—by itself—give rise to a cause of action under the Lanham Act. Thus, Group is correct that the "concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004). So were Technologies to complain only of Group's pending Japanese registration (which is preventing Technologies from registering the mark), it would fail to state a claim—absent the Court finding that the Lanham Act applies extraterritorially.

Technologies' allegations of trademark infringement and unfair competition under the Lanham Act and common law counterparts, however, are not based exclusively on Group's attempts to register the THEIA mark in foreign countries. Indeed, the complaint alleges that Group has filed applications to register for trademark protection in the United States and has already obtained licensing from at least one federal agency. The Court declines Group's invitation to read the complaint so narrowly.

But the Court understands Group to also contest the extraterritorial application of the Lanham Act. So doing, Group urges the Court to disregard any alleged harm arising from its foreign registrations as irrelevant to a U.S. trademark dispute and not redressable by this Court.[9] This means that any injunction or other relief should not extend outside the United States.

---

[8]     Group also contends that Technologies is asserting rights in registrations for the color blue. Technologies responds that references to its blue ring registrations are relevant to the likelihood of confusion analysis. According to Technologies, both companies' use of the color blue further weighs in favor of finding a likelihood of confusion. Technologies does not assert an independent claim arising from its rights in its blue ring registrations.

[9]     In its opposition, Technologies initially disclaimed that it was seeking relief with respect to the foreign registrations and applications. Instead, it argued that reference to the foreign registrations was

The Lanham Act confers jurisdiction over extraterritorial disputes involving trademark infringement and unfair competition in limited circumstances. Extraterritorial application of the Act depends on "(1) whether the defendant is a United States citizen; (2) whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's rights in the United States; and (3) whether the defendant's conduct has a substantial or significant effect on domestic commerce." *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 181 (3d Cir. 2003).[10] The first factor is indisputably satisfied and favors jurisdiction. Group, however, contends that Technologies cannot satisfy either of the two remaining factors.

As to the second factor, the Court is not unmindful of the potential for inconsistent rulings across jurisdictions. There is a pending *inter partes* proceeding before the European Union's Intellectual Property Office. And the parties continue to dispute Technologies' application to register its mark in Japan, which is currently blocked by Group's earlier-in-time application. Group urges this Court to decline exercising jurisdiction given the ongoing legal proceedings abroad. The Court is cognizant that a ruling here on allegations of infringement and unfair competition could arguably cause "interference with the sovereignty of another nation." *Steele v.*

---

relevant to the likelihood of confusion analysis. Doc. No. 15 at 10-11. Technologies has since sought to amend the relief requested as part of its preliminary injunction, without amending its complaint. Technologies now asks the Court to enjoin Group from converting its International Registrations to Japanese national trademark registrations. So, the Court must now also address whether Technologies has stated a claim under the Lanham Act to reach the alleged conduct abroad.

[10]     In 2010, the Supreme Court rejected the argument that the extraterritorial reach of § 10(b) of the Securities Exchange Act implicated subject matter jurisdiction. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253-54 (2010). The Ninth Circuit then relied on *Morrison* to hold that the extraterritorial reach of the Lanham Act is a merits—not jurisdictional—question. *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 968 (9th Cir. 2016). So doing, the appellate court articulated a circuit split as to whether a motion to dismiss premised on the fact that the complaint pleads extraterritorial conduct is properly considered under Rule 12(b)(6) or as challenge to subject matter jurisdiction under 12(b)(1). *See* 7 Callmann on Unfair Comp., Tr. & Mono. § 27:32 (4th ed. 2020). The Third Circuit Court of Appeals has not yet addressed extraterritorial application of the Lanham Act since *Morrison* but has previously characterized the inquiry as one of subject matter jurisdiction.

*Bulova Watch Co.*, 344 U.S. 280, 281 (1952); *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985) (finding conflict when defendant's petition to cancel plaintiff's foreign trademark was pending in the Philippine Patent Office). Such a risk counsels against jurisdiction, or at least, is neutral because no conflict has yet been established pending resolution of these other proceedings. *See Int'l Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1279 (11th Cir. 2001); *Southco, Inc. v. Fivetech Tech. Inc.*, 982 F. Supp. 2d 507, 513 (E.D. Pa. 2013), *aff'd*, 611 F. App'x 681 (Fed. Cir. 2015).

As to the third factor, Group contends that Technologies fails to provide evidence that Group's allegedly infringing conduct abroad has had substantial or significant effects on domestic commerce. Technologies alleges that it has been unable to get more customers in Japan because its application to register the THEIA mark in Japan—home to its primary manufacturer—is being blocked by Group's first-to-file application.[11] An American company's lost sales abroad because of trademark infringement can be considered in the "substantial effect" analysis. *Id.* That said, there are usually "additional effects in the United States beyond the diverted sales" that are necessary to the extraterritorial conduct to support jurisdiction. *See Southco*, 982 F. Supp. 2d at 514; *see also Gucci Am. Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136 (S.D.N.Y 2011) (declining to apply Act extraterritorially where plaintiff failed to submit any evidence to suggest that consumers in the United States were misled, plaintiff's marks were viewed less favorably because of

---

[11]     On these facts alone, this case parallels *Vanity Fair Mills, Inc. v. T. Eaton Co.* in which plaintiff sought to enjoin defendant—a Canadian corporation—from using a mark in Canada that it had registered prior to plaintiff's application. 234 F.2d 633 (2d Cir. 1956). Plaintiff in that case already held the same trademark in the United States. But, the Second Circuit declined to exercise extraterritorial jurisdiction because the foreign defendant had minimal contact with the United States and possessed a superior foreign right to the trademark at issue. That is not the case here: Technologies alleges that Group's contacts with the United States are more than minimal.

defendant's foreign activity, or a diversion of foreign sales). Those additional effects are at least pled here.

A showing of consumer confusion or harm to plaintiff's good will in the United States demonstrates a "substantial effect on United States commerce." *Bulova*, 344 U.S. at 286. As is discussed at length below, the Court finds that competing use of the identical THEIA marks has harmed Technologies' reputation within the domestic market and creates a likelihood of confusion. Moreover, Technologies alleges that Group has availed itself of business opportunities within the United States. Group has sought—and obtained—licensing from the FCC that will permit Group to deploy its satellite network. And it has sponsored and solicited customers at U.S. fora and trade shows addressing national security, which are attended by key stakeholders in the field. Hence, Group has availed itself of domestic channels in order to satisfy the substantial nexus prong.

So, two of the three factors support the exercise of jurisdiction under the Lanham Act to address Group's alleged conduct abroad. To be sure, the very nature of Group's business is global—if not stratospheric. And although, unresolved multiple proceedings abroad do not by themselves prevent the Court from applying the Lanham Act's protections abroad, they do "increase this Court's caution in exercising jurisdiction over matters more appropriately left to foreign courts." *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 507 (S.D.N.Y. 2013). On balance, the Court finds that extraterritorial application of the Lanham Act is not appropriate at this time.

*Second*, Group argues that Technologies' claims fail because they cannot be based exclusively on its filing of U.S. trademark applications. *See* 15 U.S.C. § 1127 (defining the term "use in commerce" to mean "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in the mark"). Group's argument, however, misses the mark:

13

Technologies asserts that its claims are predicated on Group's *use* of the allegedly infringing THEIA marks—which includes Group's undisputed use of the mark in marketing and advertising. Thus, the Court will reject Group's unduly stilted reading of the complaint.

*Third*, Group stresses that because its satellites have yet to be manufactured and launched—and will not be mission ready for years—the issue is not ripe. Technologies responds that Group's use of THEIA marks on its websites[12] which already promote the satellite network and encourage "qualified interested parties" to reach out for more information are enough to support their claims.[13] The Court must agree.

The Lanham Act imposes liability for using an infringing mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1). "[M]erely advertising an infringing mark itself is an act of infringement, apart from any manufacturing or sale." 4 McCarthy on Trademarks and Unfair Competition § 25:26 (5th ed.) (collecting cases); *see also Orthovita, Inc. v. Erbe*, No. CIV.A. 07-2395, 2008 WL 423446, at *13 (E.D. Pa. Feb. 14, 2008) ("The law does not require as a prerequisite to trademark infringement that goods already have been manufactured."); *AARP v. 200 Kelsey Assoc., LLC*, No. 06 CIV. 81 (SCR), 2009 WL 47499, at *10 (S.D.N.Y. 2009) (noting that trademark infringement litigation "is not limited to situations where the infringing mark has been used on connection with the actual sale of a product . . . rather, courts have found that trademark infringement litigation may proceed

---

[12]     Use of an infringing mark on websites in connection with the advertisement of products can sufficiently support a claim for trademark infringement at the motion to dismiss stage. *See, e.g., Valley Forge Military Acad. Found. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 456 n.3 (E.D. Pa. 2014) (allegations that defendants used the marks on their website and in email campaigns); *Liko AB v. Rise Lifts, Inc.*, 625 F. Supp. 2d 250, 253-54 (E.D. Pa. 2008) (same).

[13]     As set forth in the Court's findings of fact with respect to Technologies' motion for preliminary injunction, Group has used the THEIA marks in other ways in addition to its website-based marketing.

even in the absence of the product having been sold") (quoting *PDK Labs, Inc. v. Proactive Labs, Inc.*, 325 F. Supp. 2d 176, 180 (E.D.N.Y. 2004)). Thus, it is irrelevant to a 12(b)(1) challenge that the satellites have yet to be manufactured and launched. Because Group's ripeness argument also relies on the manufacturing timeline, it too fails.

Finally, Group reiterates various arguments to argue that Technologies cannot establish a likelihood of confusion.[14] As discussed *infra* in its determination as to Technologies' motion for preliminary injunction, the Court concludes that Technologies' claims, as pled and as supported by evidence, are quite plausible. The Court finds Technologies' position so plausible that it concludes—for purposes of ruling on the motion for preliminary injunction—that Technologies is likely to succeed on the merits. Accordingly, the Court rejects these arguments for the same reasons set forth below.[15]

Therefore, the Court denies Group's motion to dismiss in its entirety.

### THEIA TECHNOLOGIES' MOTION TO SUPPLEMENT THE RECORD AND THEIA GROUP'S MOTION TO STRIKE

After the preliminary injunction hearing and oral argument, the Court instructed the parties to submit proposed findings of fact and conclusions of law. Technologies also submitted a declaration from its counsel, Delfina S. Homen, attaching various exhibits which were not part of the record. This new evidence primarily pertains to the request for the Court to render *void ab initio* Group's U.S. applications and to enjoin it from converting its international registration into a Japanese national registration. Technologies moved to supplement the record with 12 exhibits

---

[14]     Group raises these same arguments in defending against the motion for preliminary injunction.

[15]     The Court's determination on the motion to dismiss is based on its review of the evidence as presented with respect to the motion to dismiss, not the additional evidence presented with respect to the motion for preliminary injunction. The Court refrains from reiterating a nearly identical application of the likelihood of confusion element as the one addressed in detail below.

accompanying Ms. Homen's declaration. Doc. No. 38. Rather than file a response in opposition, Group filed a separate motion to strike these exhibits and the newly requested relief.[16] Doc. No. 40.

The Court conferred with the parties in part to discuss Technologies' effort to rely on evidence not yet in the record and now addresses these post-hearing motions in tandem.[17] To provide Group with an opportunity to address the new evidence and cure any prejudice that might result from lack of proper notice, the Court also permitted an additional round of briefing limited to the new evidence and the newly requested relief to void Group's pending applications. Doc. Nos. 50, 54.

Given the posture of the case, the Court resolves the parties' competing motions prior to addressing the merits and scope of relief of Technologies' request for a preliminary injunction.

## I.     Legal Standards

### A.  Motion to Supplement

The Court may grant leave for parties to supplement the record of a case. *See Edwards v. Pa. Tpk. Comm'n*, 80 F. App'x 261, 265 (3d Cir. 2003). And, of course, it is within a court's discretion to set deadlines to receive evidence in support of a preliminary injunction. *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 329 (3d Cir. 2015). To that end, a preliminary injunction "is customarily granted on the basis of procedures that are less formal and

---

[16]     Technologies contends that its claim to cancel Group's pending U.S. applications is not "new" relief. The Court disagrees. Technologies' Complaint sought relief enjoining Group from registering and attempting to register the THEIA mark and for an order directing Group to abandon its U.S. applications. Technologies' cancellation claim differs in kind and effect from an injunction pending a decision on the merits. Technologies does admit the basis to cancel the pending applications—the lack of bona fide intent—is new. The operative facts supporting a lack of bona fide intent arose only following the preliminary injunction hearing.

[17]     After the hearing, the parties also submitted a joint motion to seal portions of the evidentiary hearing transcript, Doc. No. 39, which the Court granted in a prior order, Doc. No. 42.

evidence that is less complete than in a trial on the merits." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004). Courts can receive and consider affidavits and other hearsay material. *Id.*; *see also Sills Rd. Realty LLC v. Town of Brookhaven*, No. CV074584TCPETB, 2008 WL 11449282, at *1 (E.D.N.Y. July 10, 2008) ("[T]he exigencies of a preliminary injunction hearing permit some relaxation of the rules of evidence."). Finally, in considering whether to permit a supplement to the record, the Court can be guided by whether the new information will affect its determination of the matter.

### B. Motion to Strike

Under Rule 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike "clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Edwards v. Morgan*, No. CV 19-1897, 2020 WL 6873486, at *3 (E.D. Pa. Nov. 23, 2020) (citing *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)). Motions to strike are generally disfavored.

## II. Discussion

Except for Exhibit L, the Court grants Technologies' motion to supplement and denies Group's motion to strike the additional exhibits.

*First*, the Court will admit the new exhibits which are public records. Trademark applications and responses are publicly available and certified. The Court takes judicial notice of Technologies' newly submitted Exhibits A, B, E, F, J, and K—all of which are from the U.S. Patent & Trademark Office's public files of Group's trademark applications at issue. Fed. R. Evid. 201(b)(2). *Bath Auth., LLC v. Anzzi LLC*, No. CV 18-00834, 2018 WL 5112889, at *4 (E.D. Pa.

17

Oct. 19, 2018) (taking judicial notice of application for federal registration of mark); *Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 319 n.7 (D.N.J. 2006) (same).

Exhibits G and H are also public records, being published by the World Intellectual Property Organization ("WIPO") and the Japanese trademark office.[18] Technologies contends that these exhibits are relevant to its irreparable harm argument, the Court's jurisdiction to address that harm extraterritorially, the relief sought, and the resolution of facts central to the findings. And, Technologies asserts these exhibits show that Group filed a perjurious sworn declaration regarding its continuing bona fide intent to use the THEIA mark on all goods and services in the applications just hours after the hearing concluded. Because the Court separately considers the merits of the relief sought below, it limits its discussion here to resolving the competing motion to supplement and motion to strike.

Judicial notice may be taken at any stage of a proceeding, provided it is not unfair to a party. *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 277 n.8 (3d Cir. 2013). When the party opposing notice of the USPTO filings is the one that filed them, the Court is hard-pressed to find any prejudice or surprise.

Group sensibly does not contest that these exhibits are subject to judicial notice. Instead, it moves to strike these exhibits as untimely offered, even as it concedes that at least two of the exhibits did not exist during the evidentiary hearing, meaning that Technologies could not have offered them earlier. Nor is Group's claim that it was denied an opportunity to address these

---

[18]    Because Exhibits A, B, E, F, G, H, J, and K are all publicly available documents from federal agencies and government entities, the Court could take judicial notice of these documents, even if they were not offered and admitted into the record. *See Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 258-59 (E.D. Pa. 2020) ("Courts may also take judicial notice of 'records and reports of administrative bodies.' . . . [I]nformation found on government websites is widely considered both self-authenticating and subject to judicial notice."); *U.S. v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139-40 (E.D. Pa. 2012) (noting court may take judicial notice of public records of federal agencies and government records).

exhibits still viable. Indeed, the Court granted Group an additional round of briefing for the express limited purpose of addressing the new evidence.[19]

*Second*, the Court will admit Exhibits C and D, excerpts from the Rule 30(b)(6) deposition of Mr. Fargnoli and Rule 30(b)(1) deposition of Mr. Gallagher. Technologies offers the deposition testimony to support its new claim that Group's pending U.S. trademark applications should be cancelled because they lack *bona fide* intent. So, Technologies contends, the applications are void. Technologies relies on these testimonial statements to contradict testimony provided at the hearing and the filings made to the USPTO only hours after the hearing concluded. Technologies goes so far as to suggest that Group's filing for extensions of time for its pending applications constitute perjury.

Technologies points out that it had no way of knowing that hours after the hearing in Court Group would submit the statements to the USPTO that Technologies now claims are perjurious. That is why this case is not on all fours with *Bowers v. City of Philadelphia*, the case Group urges upon the Court. No. 06 CV 3229, 2007 WL 172373 (E.D. Pa. Jan. 18, 2007). The *Bowers* court granted a motion to strike deposition testimony included in the defendants' proposed findings and conclusions. There, the court had already conducted a four-day hearing which afforded defendants' "ample opportunity to present" the evidence at issue. *Id.* at *3. Here again, Technologies could not have offered exhibits prior to the hearing that only became pertinent upon

---

[19]     Group admits that Exhibits E and F are PTO filings did not exist during the evidentiary hearing but were available before the parties' deadline to file proposed findings and conclusions. Instead, Technologies filed a single motion to supplement. Group seems to suggest that piecemeal motions to supplement would have been a more efficient use of the parties' and the Court's resources. Given the rounds and rounds of supplemental briefing necessary for resolution of the preliminary injunction, the Court cannot agree. Certainly, Group was not denied an opportunity to respond.

         Moreover, presumably for its own reasons, Group did not alert either Technologies or the Court of its post-hearing filings with the USPTO, although it would have been appropriate to do so. The Court only learned of the filings in Technologies' motion to supplement.

19

actions taken by Group after the hearing. Although the parties here each lay claim to the goddess of sight, the Court doubts that either party possesses the ability to see into the future.

The Court recognizes the finite time during the hearing which arguably restricted the parties' ability to impeach witnesses with earlier contradictory deposition testimony. That is why the Court is not so bound by such strict dictates that Group seeks to impose.

*Third*, Technologies also seeks to supplement the record with Exhibit I, a recently published *Forbes* article identified by Group's Rule 30(b)(6) deposition through Mr. Gallagher. It offers this article to support its position that Group received unsolicited media coverage. Group has not moved to strike this exhibit. The Court can take judicial notice of the existence of newspaper articles and that the information contained therein was publicly available. *In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-02002, 2011 WL 5980001, at *6 (E.D. Pa. Nov. 30, 2011). So, it will admit Exhibit I.

The Court will deny Technologies' motion to supplement and grant Group's motion to strike Exhibit L—a slide-deck that Technologies used during oral argument. Because the Court asked Technologies to provide copies of these slides for their demonstrative purposes only, the Court declines to admit these slides into the motion for preliminary injunction record.

### THEIA TECHNOLOGIES' MOTION FOR PRELIMINARY INJUNCTION

The Court now turns to setting forth its findings and conclusions germane to the preliminary injunction dispute.

### I.     Findings of Fact

The Court held two days of hearings on the factual issues underlying this preliminary injunction.

## A. Nature of the Suit

1.      This is an action for trademark infringement, false designation of origin, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and common law trademark infringement and unfair competition. Compl. ¶ 1 (Doc. No. 1).

## B. The Parties and Related Entities[20]

2.      Theia Technologies is an Oregon limited liability company with its principal business address in Wilsonville, Oregon. Compl. ¶ 7.

3.      Defendant Theia Group, Inc. (Theia Group) is a Delaware corporation with its principal business address in Philadelphia, Pennsylvania. Compl. ¶ 8. Theia Group, Inc. also has offices in Washington, D.C. *See* Pl.'s Hr'g Ex. 19 at 1. Theia Group was formed in September 2015. Hr'g Tr. Day 2 at 59:15-17.

4.      Defendant Theia Holdings A, Inc. (Theia Holdings) is a Delaware corporation with its principal business address in Philadelphia, Pennsylvania. Compl. ¶ 9 (Doc. No.1).

5.      Theia Group and Theia Holdings A are related entities: Theia Holdings A is a 100% owned and controlled subsidiary of Theia Group. Hr'g Tr. Day 2 at 20:21-21:6; Pl.'s Hr'g Ex. 27.

6.      Theia Group is also the parent to three other "Theia"-named companies: Theia Aviation, LLC; Theia Risk Management Systems, Inc.; and Theia Insurance, Inc. Hr'g Tr. Day 2 at 20:21-21:5; Pl.'s Hr'g Ex. 27.

7.      Theia Aviation, LLC is a subsidiary that owns airplanes and is responsible for planning a test run of the satellite technology with airplanes later this year. Hr'g Tr. Day 1 at 124:1-4; Hr'g Tr. Day 2 at 21:14-17. Theia Aviation currently employs 15 to 20 employees. Theia

---

[20]     For purposes of this section only, the Court refers to the parties by their full corporate names.

Aviation's finances are not currently separate from Theia Group although it is expecting to generate independent income in 2021 from contracts currently in stages of negotiation. Hr'g Tr. Day 2 at 22:4-14.

8.      Theia Risk Management Systems, Inc. is the anticipated insurance vehicle for Theia Group. Hr'g Tr. Day 2 at 22:14-18. Theia Risk Management Systems currently employs ten to twenty data scientists who are developing algorithms for data analysis. *Id.* at 22:19-24. Theia Group anticipates further fleshing out the insurance feature of the business in 2021. *Id.* at 22:25-23:3.

## C. Technologies' Lenses, Optics, and Related Software

9.      Technologies designs optical systems—primarily lenses and related software—for sale to a global and diverse customer base. Hr'g Tr. Day 1 at 11:16-20. Technologies' lenses can be used by any industry. *Id.* at 12:16-18. Although most of its lenses are for industrial use, Technologies also sells to hobbyists. *Id.* at 13:1-8.

10.     Technologies' lenses are capable of imaging both invisible and infrared wavelengths. Hr'g Tr. Day 1 at 20:6-10. Many of its lenses conduct hyperspectral imaging from the visible and infrared wavelengths simultaneously. *Id.* at 20:11-13. Its lenses and optics can be used any distance from the Earth's surface and can be used underwater. *Id.* at 20:14-16, 84:19-22.

11.     The software for Technologies' lenses controls the parameters of the lens and enables their use. Hr'g Tr. Day 1 at 20:17-21. Technologies' software can be used to analyze data collected from lenses and is compatible with non-Technologies lenses. *Id.* at 20:25-21:5.

12.     Technologies' lenses and related software have many applications, including infrastructure monitoring, traffic monitoring, security and surveillance, machine vision, and monitoring of ports. Hr'g Tr. Day 1 at 13:11-15.

22

a.  Technologies' lenses have already been used on spacecraft. *Id.* at 14:1-14. Technologies' lenses have been used in the SpaceX Dragon Capsule to view the astronauts and on NASA's Global Hawk Drone, *id.* at 14:2-14, 14:12-14, and on the Japanese Space Agency JAXA's Hayabusa 2 rovers that are currently on asteroids in the asteroid belt, *id.* at 14:6-8.

b.  Similarly, its lenses have aeronautics applications and have been used in aircraft manufactured by major aerospace companies for monitoring flights. *Id.* at 12:13-15, 17:11-16.

c.  Over half of Technologies' business involves sales of optics for security and surveillance. Hr'g Tr. Day 1 at 5:11-13. Technologies' customers in the security and surveillance space include well-known companies. *Id.* at 17:8-10. Sales to municipalities for use in traffic monitoring and accidents accounts for approximately 20% of its business. *Id.* at 15:4-10. Use of Technologies' products in traffic/accident monitoring and loss prevention has insurance implications. *Id.* at 16:3-9; 17:4-7.

d.  The third largest market for Technologies is the machine vision and factory automation market. Hr'g Tr. Day 1 at 16:11-14.

e.  There is also a growing market for robotics, *id.* at 16:14, and for use in agriculture, including crop monitoring and developing and excavating crop areas, *id.* at 16:24-17:3.

f.  Technologies is developing lenses to use on weather balloons and satellites. *Id.* at 13:15-17, 13:21-25.

g.  Finally, its lenses also have infrastructure applications, including monitoring

23

shipping channels and bridge structures. *Id.* at 17:17-21.

13.     In addition to selling off-the-shelf lenses, Technologies also designs and sells custom lenses for all types of industries and for any customer who wants a custom lens. Hr'g Tr. Day 1 at 95:15-96:6, 17:22-25.

14.     Technologies sells or offers to sell goods and services to government agencies and militaries, industrial companies, municipalities, as well as at retail to ordinary consumers. Hr'g Tr. Day 1 at 18:1-13, 15:14-15.

15.     The typical retail unit price for Technologies' lenses is between $300 and $500. Hr'g Tr. Day 1 at 18:16-17. Its lowest prices lens costs approximately $65. *Id.* at 18:14-16. Specialized sales, such as for a military program, can reach into the hundreds of thousands of dollars. *Id.* at 18:17-19.

16.     Technologies markets its goods or services through its website and sells or offers to sell its goods and services through in-person meetings. Hr'g Tr. Day 1 at 18:20-24, 38:17-20. It also sells or offers to sell its goods and services at trade shows, typically attending six to eight trade shows per year in the security and surveillance, logistics/infrastructure, machine vision, and robotics industries. *Id.* at 18:23-24, 96:7-97:2. Technologies will travel for face-to-face meetings with its large and primary customers. *Id.* at 19:5-7, 8-13. It is a member of the Pacific Northwest Defense Coalition. Through that membership, it conducts meetings with customers in the military and defense industry. *Id.* at 18:6-9. Technologies also sells on other digital marketing platforms through magazine advertisements for certain industries. *Id.* at 18:24-19:1.

**D. Technologies' THEIA Trademarks**

17.     Technologies owns the incontestable U.S. Trademark Reg. No. 3,473,019 for the word mark THEIA for "photographic devices, namely, lenses; optics, namely, lenses" ('019

24

Registration). Pl.'s Hr'g Ex. 2; Hr'g Tr. Day 1 at 21:9-23:17, 24:7-21. Technologies has continuously used THEIA in commerce for the goods listed in the '019 Registration since November 20, 2007. Pl.'s Hr'g Ex. 2; Hr'g Tr. Day 1 at 23:18-24:6. The '019 Registration does not include any restrictions as to the channels of trade nor any restriction as to the intended consumers for the goods covered by the registration. Pl.'s Hr'g Ex. 2. Technologies uses the THEIA mark covered by the '019 Registration for goods sold or offered for sale through any and all channels of trade and to any and all types of customers. Hr'g Tr. Day 1 at 24:7-21. The application that matured into the '019 Registration was filed January 25, 2007, and the '019 Registration issued July 22, 2008. Pl.'s Hr'g Ex. 2.

18.     Technologies also owns U.S. Trademark Reg. No. 4,834,657 for the word mark THEIA for "downloadable mobile applications for calculating image resolution and simulating pictures; downloadable software in the nature of a mobile application for use in association with closed circuit TV systems for security and surveillance; lens calculating software for analyzing data to calculate resolution" ('657 Registration). Pl.'s Hr'g Ex. 4; Hr'g Tr. Day 1 at 26:5-27:7. The '657 Registration covers software related to Technologies' lenses and optics and software for analyzing data collected from images. Hr'g Tr. Day 1 at 18-27:7. Technologies has continuously used THEIA in commerce for the goods listed in the '657 Registration since October 5, 2010. Pl.'s Hr'g Ex. 4; Hr'g Tr. Day 1 at 27:8-24. The '657 Registration does not include any restrictions as to the channels of trade or any restriction as to the intended consumers for the goods covered by the registration. Pl.'s Hr'g Ex. 4. Technologies uses the THEIA mark covered by the '657 Registration for goods sold or offered for sale through any and all channels of trade and to any and all types of customers. Hr'g Tr. Day 1 at 27:25-28:14. The application that matured into the '657 Registration was filed August 7, 2014, and the '657 Registration issued

October 20, 2015. Pl.'s Hr'g Ex. 4.

19.     Technologies also owns the European Union trade mark Filing No. 010012466 for the mark THEIA for, among other things: "Photographic, cinematographic and video camera apparatus, namely, lenses, filters, aimers; optical apparatus, namely, prisms, mirrors, lenses, filters; accessories and fittings for photographic, cinematographic and video camera lenses; software for use in relation to photographic, cinematographic and video camera lenses; imaging software" ('466 EUTM Registration). Pl.'s Hr'g Ex. 5; Hr'g Tr. Day 1 at 28:15-30:7. The '466 EUTM Registration covers Technologies' lenses and optics and software for analyzing data collected from images. Hr'g Tr. Day 1 at 29:13-30:7. The application that matured into the '466 EUTM Registration was filed on June 1, 2011, and the '466 EUTM Registration issued November 2, 2011. Pl.'s Hr'g Ex. 5.

20.     Technologies also owns EUTM Filing No. 013314869 for the mark THEIA for "Computer software; computer software for use with security and surveillance equipment; computer software for use in relation to cameras and video equipment; computer software for use in relation to image manipulation; downloadable mobile applications for calculating image resolution and simulating pictures; downloadable software in the nature of a mobile application for use in association with closed circuit TV systems for security and surveillance; lens calculating software" ('869 EUTM Registration). Pl.'s Hr'g Ex. 6; Hr'g Tr. Day 1 at 30:8-31:10. The '869 EUTM Registration covers Technologies' software related to lenses and software for analyzing data from images. Hr'g Tr. Day 1 at 30:24-31:10. The application that matured into the '869 EUTM Registration was filed on October 1, 2014, and the '869 EUTM Registration issued February 24, 2015. Pl.'s Hr'g Ex. 5.

21.     In addition to the European Union registrations, Technologies has applied to

26

register THEIA in other countries, including Japan. Hr'g Tr. Day 1 at 31:17-20. Its Japanese registration efforts are currently blocked by Group's International Reg. No. 1457362. *Id.* at 31:21-24. Group also filed to cancel Technologies' '869 EUTM Registration on May 27, 2020. *Id.* at 32:17-33:6; Pl.'s Hr'g Ex. 7.

22.     Technologies displays its THEIA trademark on its website, www.theiatech.com. Pl.'s Hr'g Ex. 8-9; Hr'g Tr. Day 1 at 35:1-37:5, 38:5-39:4. Technologies uses its website to showcase its products and their applications and to sell its products to interested parties. Hr'g Tr. Day 1 at 38:16-20. For example, the website highlights Technologies' lenses that have been used on satellites, including an image on its home page taken from the NASA Global Hawk Drone at about 60,000 feet above the Sierra Nevadas. *Id.* at 37:18- 38:4 (referring to Pl.'s Hr'g Ex. 8). Technologies' website also includes information on where to buy its products and how to contact it. *Id.* at 38:1-39:2.

23.     Technologies also uses its THEIA trademark on its marketing brochures. Pl.'s Hr'g Ex. 10; Hr'g Tr. Day 1 at 39:10-25, 40:14-18. These marketing brochures are available through its website, distributed via email and at trade shows, and are given to interested parties during face-to-face meetings. Hr'g Tr. Day 1 at 40:9-13.

24.     Technologies also places its THEIA trademark directly on its lenses and optics as well as on its product packaging.[21] Pl.'s Hr'g Ex. 10 at 1; Defs.' Hr'g Ex. 20 at 1 Hr'g Tr. Day 1 at 40:19-41:13, 41:14-18. Technologies also uses its THEIA mark on its letterhead and in every correspondence it sends. Hr'g Tr. Day 1 at 41:14-19. Sometimes the word "Technologies"

---

[21]     Some of Technologies' product packaging includes the name of one of its manufacturing partners, Nittoh. Hr'g Tr. Day 1 at 37:6-11. However, Technologies and Nittoh are separate companies, and Technologies does not always use the Nittoh name on its product packaging. *Id.* at 37:12-17, 93:1-9. Technologies has a quality control agreement with Nittoh regarding manufacture of the lenses. *Id.* at 93:10-94:3.

27

appears in conjunction with Technologies' THEIA mark. *Id.* at 41:20-42:4.

25.     Aside from the particular "first use in commerce" dates listed in the '019 and '657 Registrations, Technologies first used the THEIA mark in early 2006. Hr'g Tr. Day 1 at 42:5-9. Its first use of THEIA on its website was approximately in December 2006. *Id.* at 42:10-13. So, Technologies has used the THEIA trademark publicly in association with its goods and services for approximately 14 years. *Id.* at 42:14-16.

26.     From 2008 through the end of 2019, Technologies made approximately $77 million in sales, all of which are attributable to the THEIA mark. Hr'g Tr. Day 1 at 43:1-7. Each year, Technologies spends approximately $150,000 on marketing and advertising—not including travel. The company spends its entire marketing budget under the THEIA mark. *Id.* at 43:8-14.

### E. Group's Use of the THEIA Trademark

27.     Group plans to launch a satellite network which will be comprised of 112 satellites, each orbiting outside of the Earth's atmosphere at approximately 500 miles above the Earth's surface. Pl.'s Hr'g Ex. 18; Defs.' Hr'g Ex. 11; Hr'g Tr. Day 1 at 113:7-19 (discussing Defs.' Hr'g Ex. 11); Hr'g Tr. Day 2 at 9:4-17.

28.     According to John J. Gallagher, Group's Corporate Secretary, a member of the Board of Directors, and a co-founder of the company, Group did not have a website until October 2019 because it was trying to remain "discreet" and did not want to publicize its name and what it was doing. Hr'g Tr. Day 2 at 4:2, 4:20-23, 18:8-11, 33:22-34:20.

29.     Nonetheless, some information about Group and its goods and services was in the public forum prior to October 2019. Group filed an application for a satellite network with the Federal Communications Commission (FCC) on or about November 15, 2016. *See* Pl.'s Hr'g Ex. 18 at 6; Pl.'s Hr'g Ex. 20 at 1 n.1. Group's Chief Technology Officer, co-founder, and witness

28

at the preliminary injunction hearing, Joseph D. Fargnoli, signed and certified a document associated with that filing titled "Technical Narrative Theia Satellite Network." *See* Pl.'s Hr'g Ex. 18 at 6; Hr'g Tr. Day 1 at 100:13-102:6.  That document stated that Group's THEIA goods and services will be provided to a "variety of users," including "individual[s], commercial and government users" in several industries "including but not limited to" atmospheric sciences, agriculture, natural resources exploration, insurance, infrastructure protection, and security; and Group's THEIA satellite network will incorporate "remote sensing" and "signal processing" payloads, will deliver those payloads directly to the aforementioned end users, and will include "sensors" that capture visible and invisible still and video imagery.  Pl.'s Hr'g Ex. 18 at 3, 4-5.

30.     The FCC granted in part Group's application for the THEIA satellite network on May 10, 2019.  *See* Pl.'s Hr'g Ex. 20.  The FCC memorandum approving the THEIA satellite network confirms the network will "conduct imaging of the entire surface of the Earth," and will "obtain[], process[], and deliver[] remote sensing analytics" to "commercial, industrial, and consumer customers."  *Id.* at 1-2.  The network will "capture continuous visible and broad infrared video of the entire Earth, [and] near continuous high-resolution hyperspectral and active radar data," and will "provide this data to individuals and institutions around the world."  *Id.*  The network will provide "precision agriculture analytics, surveying and monitoring of infrastructure, and real-time geophysical information and first responder support.  So doing, it "will vastly increase the Earth-imaging data available to consumers."  *Id.*

31.     Group's applications to register its marks in the United States supplied additional information about the company and its THEIA goods and services.  The applications were published for opposition on May 21, 2019.  U.S. Trademark Appl. Ser. No. 87/954,755 ('755 Application) seeks to register the word mark THEIA.  U.S. Trademark Appl. Ser. No. 87/954,776

29

('776 Application) seeks to register a THEIA design mark. Pl.'s Hr'g Ex. 11-12. Both applications seek to register THEIA for goods as Class 9 trademarks. This class includes "sensors" for use on satellites that "measur[e] and monitor[] activity taking place on [and] above the earth's surface," as well as related software. Pl.'s Hr'g Ex. 11 at 1; Pl.'s Hr'g Ex. 12 at 1.

32.     The '755 and '776 Applications also seek to register THEIA for services in Class 42 that includes analyzing data from "sensors" that capture imaging data, such as analyzing imaging data, including for commercial, agricultural, geologic, and energy and industrial applications. Pl.'s Hr'g Ex. 11 at 1; Pl.'s Hr'g Ex. 12 at 1.

33.     In 2018, Group obtained World Intellectual Property Organization (WIPO) International Reg. No. 1457362 for the mark THEIA for the goods and services listed in the '755 and '776 Applications. *See* Doc. No. 36-8.[22] This WIPO registration relies on Group's '755 Application for extension under the Madrid Protocol.[23] *See id.* The registration designated numerous countries, including Japan, and has been cited by the Japanese trademark office against Technologies' application to register THEIA in Japan, thereby blocking Technologies' Japanese application. *See id.*; Doc. No. 36-9.[24]

34.     Group's '755 and '776 Applications were both filed under § 1(b) of the Lanham Act, claiming a bona fide intent to use the mark on the listed goods and services as of the date the

---

[22]     The Court can take judicial notice of Group's WIPO registration. *In re NAHC*, 306 F.3d 1314, 1331 (3d Cir. 2002); Fed. R. Evid. 201(b).

[23]     WIPO does not conduct a substantive examination of applications prior to allowance. Rather, it will review for compliance with application requirements and notify a rightholder of a potential conflict. WIPO registration simplifies the trademark application process for applicants seeking trademark protection in countries that are parties to the Madrid System treaty.

[24]     The Court can take judicial notice of the Japanese Notification of Provisional Refusal. *See In re NAHC*, 306 F.3d at 1331; Fed. R. Evid. 201(b).

applications were filed. *See* Pl.'s Hr'g Ex. 11 at 1; Pl.'s Hr'g Ex. 12 at 1. James Hickey, Group's corporate secretary, signed the declarations for both applications, under penalty of perjury under 18 U.S.C. § 1001, attesting that Group "has a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application. Doc. No. 36-2; Doc. No. 36-3.[25]

35.     During discovery for the preliminary injunction hearing, Group's witnesses testified that the company would not be selling satellite hardware under the Theia name. Rather, Group planned to sell "services but not goods." Doc. No. 36-4 (Fargnoli Depo. Tr. at 41:6-8, 141:13-19, 89:3-4, 89:21-25).

36.     Mr. Fargnoli testified that, "We don't intend to sell hardware. We are strictly a services company." Hr'g Tr. Day 1 at 131:3-10. Mr. Fargnoli further stated that Group's services are "information analytics." *Id.* at 131:11-13. Mr. Gallagher also confirmed that Group does not sell any goods. Hr'g Tr. Day 2 at 62:12-63:4.

37.     Testimony at the hearing provided additional insight into the timeline by which Group anticipated selling the data analytics obtained through its satellite network. According to Mr. Gallagher, Group's THEIA satellite network will not begin to deploy until three or so years from now and would take two and a half years to fully deploy. So, full deployment would be sometime in January 2026. Hr'g Tr. Day 2 at 52:1-5.

38.     A few hours after the hearing concluded, Group submitted requests to the USPTO to extend its time to file statements of use for both the '755 and '776 Applications. Group attested to its bona fide intent to use the THEIA marks for all of the listed goods and services by July 16, 2022. This filing was signed by Mr. Gallagher and submitted by Group's trial counsel, Mr. Bonini. Doc. No. 36-6 at 6; Doc. No. 36-7 at 6.

---

[25]     The Court can take judicial notice of Group's trademark filings. *See In re NAHC, Inc.*, 306 F.3d at 1331; Fed. R. Evid. 201(b).

31

39.     Group's THEIA satellite network will have imaging capability and its "analytics" will include analysis of data from images.  During his Rule 30(b)(6) deposition, Mr. Fargnoli testified that the THEIA satellite network would include various "sensors," including a full motion video sensor that will provide video imaging of the earth and will utilize a lens or optics, and a hyperspectral imager that also utilizes optics.  Fargnoli Depo. Tr. at 38:14-39:15, 69:8-19.  During the hearing, Mr. Gallagher confirmed that the information obtained through the THEIA satellite network will include images or image data and that Group will be selling analysis of this data. Hr'g Tr. Day 2 at 41:23-42:9.  Mr. Gallagher also confirmed that with regard to the "sees everything" portion of "TSN SEES EVERYTHING, EVERYWHERE, ALL THE TIME"—a heading in Group investor materials—if someone is not in a building, the THEIA satellite network will capture it on video.  *Id.* at 38:16-21 (discussing Defs.' Hr'g Ex. 11 at 5).

40.     Group has used the THEIA mark in the following ways:

   a. Group is using the THEIA mark on its website, www.theiagroupinc.com. Pl.'s Hr'g Ex. 15-17; Defs.' Hr'g Ex. 1.  Group uses its website, including a video on the website, as part of its "pitch" with potential investors and "partners" (*i.e.*, customers).  Hr'g Tr. Day 2 at 34:21-23, 35:4-7.  Group's website is publicly available.  There is no special access needed to see its content.  *Id.* at 35:8-10.

   b. The THEIA mark is included on Group's investor/partner pitch materials. *See, e.g.*, Defs.' Hr'g Ex. 11; Pl.'s Hr'g Ex. 18-19; Hr'g Tr. Day 1 at 124:22-126:4. Group supplies these materials to potential investors and partners during in-person, face-to-face meetings.  Hr'g Tr. Day 1 at 105:4-106:5, 126:5-19; Hr'g Tr. Day 2 at 36:11-20; 37:3-18.

32

c. Group currently has multiple pending contracts with unnamed sovereign nations that are worth a substantial amount of money and were slated to close in 2020. Hr'g Tr. Day 2 at 24:10-23; Defs.' Hr'g Ex. 5, 6, 27. To that end, Group's pending contracts are worth more than the anticipated total cost of the THEIA satellite network when fully deployed. Hr'g Tr. Day 2 at 32:14-20.

d. Group plans to raise substantial amounts of funds through additional sovereign nation contracts, Hr'g Tr. Day 2 at 54:3-6, and raise additional funds through traditional lending sources, *id.* at 23:23-24:1. Group has already raised a substantial amount of funding from dozens of investors under contract, who are mainly friends and family. *Id.* at 32:4-13.

e. Group is currently working toward launching the THEIA satellite network, has already spent a substantial amount of money in its efforts toward launching the satellite network, and plans on using existing "sensors" already available on the market from various companies, such as two unnamed companies which are current customers of Technologies. Hr'g Tr. Day 2 at 31:5-22.

f. Group is expanding its employee roster and already has approximately 131 employees and contractors. Hr'g Tr. Day 2 at 31:23-32:3. Additionally, over 320 engineers are working on the THEIA satellite network. *Id.* at 37:19-38:11.

g. Group planned to test its technology with airplanes in late 2020. Hr'g Tr. Day 1 at 123:25-124:4.

h. Group was a gold sponsor at the Reagan National Defense Forum, an annual event that brings together key stakeholders to address the health of the U.S.'s

national defense and to promote policies to strengthen the U.S. military. Hr'g Tr. Day 2 at 35:15-22.

   i.   Group is a sponsor of the National Space Foundation. The National Space Foundation hosts the largest space industry trade show each year. Hr'g Tr. Day 2 at 35:23-36:10.

   j.   Group is parent to four Theia companies, two of which—Theia Aviation, LLC and Theia Risk Management Systems, Inc.—are actively working toward realizing Group's goals. Hr'g Tr. Day 2 at 20:24-23:3.

   k.   As one of the industries it seeks to serve, Group is in discussions with an insurance company and has done a "reasonably deep dive in insurance." Hr'g Tr. Day 2 at 28:11-20, 38:25-39:14.

41.   The following evidence shows overlap in Technologies' and Group's consumers:

   a.   Most of Technologies' lenses are used for business: its main consumers are government agencies, militaries, and industrial companies. Hr'g Tr. Day 1 at 13:1-8, 18:4-13. Similarly, Group has thousands of "verticals"[26], and its data "can be used by all sorts of different companies and different industries." Hr'g Tr. Day 2 at 40:12-13, 41:4-15. Group's "verticals" include industries which Technologies already serves, including agriculture, infrastructure, security, insurance, and the military. Hr'g Tr. Day 1 at 13:13-18, 14:24-16:14, 16:24-17:25; Hr'g Tr. Day 2 at 39:3-7. Group testified that its satellite network and its capabilities will benefit the security and surveillance and aerospace industries. Hr'g Tr. Day 2 at 42:10-16.

---

[26]   Group refers to its commercial targets and industries as "verticals". Hr'g Tr. Day 1 at 123:15-24; Hr'g Tr. Day 2 at 38:25-39:18.

b. In addition to "partnering" with sovereign nations, Group intends to expand into other commercial ventures and plans to do so once it secures additional funding. Hr'g Tr. Day 2 at 41:19-43:12.

c. Technologies' consumers include hobbyists. Hr'g Tr. Day 1 at 13:5-8. Likewise, Group anticipates that individuals will use its services. Indeed, the FCC application and approval states that the services will be provided to individuals. Pl.'s Hr'g Ex. 18 at 3; Pl.'s Hr'g Ex. 20 at 1-2. And Mr. Gallagher testified that Growth's real growth and revenue will derive from individual usage in the United States. Hr'g Tr. Day 2 at 40:24-41:2. He offered as an example a teenager that develops an algorithm and uses Group's services to capture data. (Mr. Gallagher proposed that this intrepid individual might want to count whales or follow whales in the ocean.) *Id.* at 40:5-15.

d. Technologies already collaborates with universities, partnerships that Group plans to also pursue. Hr'g Tr. Day 2 at 42:16-18; Hr'g Tr. Day 1 at 13:21-25.

42. Both parties use websites—each of which display the THEIA marks—to reach prospective customers and partners. Hr'g Tr. Day 2 at 34:21-23, 35:4-7, 89:12-13. And both parties market their products through in-person, face-to-face meetings, as well as at trade shows or industry forums. Hr'g Tr. Day 1 at 18:20-24.

43. Group anticipates that it will "not be unlike Apple in terms of a data platform." Hr'g Tr. Day 2 at 40:16-22. Mr. Fargnoli testified that "Everyone on earth" will benefit from the THEIA satellite network. Fargnoli Depo. Tr. at 90:16-18.

**F. Group's Selection and Adoption of the THEIA Trademark**

44.    Group began using the THEIA mark in September 2015. Hr'g Tr. Day 2 at
43:23-44:1.  Group limited its due diligence to searching the Delaware Secretary of State's
database; it did not search the USPTO's database at that time. *Id.* at 43:23-44:4.

45.    In September 2015, Technologies' '019 Registration for THEIA for lenses and
optics was registered with the USPTO. So, it was publicly available on the USPTO's database.
Pl.'s Hr'g Ex. 2. The application that matured into Technologies' '657 Registration for THEIA
for related software was also on file at the time, and hence publicly available, through the
USPTO's database. The '657 application was issued as the '657 Registration in October 2015.
Pl.'s Hr'g Ex. 3. Technologies' website was publicly available in September 2015. Hr'g Tr. Day
1 at 42:10-13.

46.    Group conducted some sort of an investigation into THEIA in 2017, which
presumably turned up Technologies' registrations.  By 2017, both of Technologies' registrations
had issued and were publicly available through the USPTO database and its website was live.
Pl.'s Hr'g Ex. 2, 3; Hr'g Tr. Day 1 at 42:10-13. Mr. Gallagher, however, was instructed not to
answer questions into that investigation based on claimed attorney-client privilege and, hence,
did not answer those questions. Hr'g Tr. Day 2 at 44:5-13.

**G. Technologies' Discovery of Group's Use of THEIA**

47.    Technologies first learned of Group's applications to register the THEIA mark
in April 2019. Hr'g Tr. Day 1 at 43:21-44:7, 45:13-46:11.  The applications were for the same
standard character mark and for goods and services appearing to overlap with Technologies'
THEIA goods and services. That is why Technologies viewed the applications as loss of control
over the THEIA mark. *Id.* at 44:13-45:12, 46:12-23.

36

48.     After learning of Group's applications, Technologies sought more information about Group. However, at the time, little information was publicly available. Group's website was not yet live. Hr'g Tr. Day 1 at 46:24-47:4. But Technologies did locate an article referring to the THEIA satellite network as "spy satellites." *Id.* at 47:4-7; Pl.'s Hr'g Ex. 13 at 1. "Spy satellites" generally carries a negative connotation. Technologies was concerned by such an association with its THEIA mark and did not want to be associated with a satellite network that was allegedly spying on people. Hr'g Tr. Day 1 at 48:12-19.

49.     On August 8, 2019, Technologies sent Group a letter detailing its ownership of and rights in and to the THEIA mark, and seeking more information about Group's use of THEIA. Hr'g Tr. Day 1 at 50:4-16; Pl.'s Hr'g Ex. 14. Group did not respond to the letter nor did it respond to repeated follow-up attempts. Hr'g Tr. Day 1 at 51:4-11; Hr'g Tr. Day 2 at 46:15-21. Mr. Gallagher did not know when Group, as opposed to its counsel, received Technologies' August 2019 letter. Hr'g Tr. Day 1 at 46:4-6. Mr. Gallagher testified that he became aware of the letter only the day before his June 26, 2020 deposition. *Id.* at 46:7-9.

50.     Group took no overt action in response to Technologies' letter, such as changing its name. Hr'g Tr. Day 2 at 46:22-25. Instead, two months later, Group launched its website in October 2019 and continued to invest in the THEIA mark. *Id.* at 47:1-9. Group did not inform its investors of the dispute then. *Id.* at 44:24-45:2. Its investors were not informed of this dispute even after the lawsuit was filed or before Group filed its opposition to the Motion for Preliminary Injunction. *Id.* at 45:3-9. Group admitted it has not undertaken any kind of mitigation efforts in the event it lost the right to use THEIA. *Id.* at 61:7- 11.

37

## H. Discovery Disputes Before the Preliminary Injunction Hearing[27]

51.     Technologies served its first set of informal discovery requests on Group in February 2020. Technologies then propounded a set of formal discovery requests in May—again seeking the same categories of information. Group stated on June 2, 2020 that it would not respond to the formal requests.

52.     To address the discovery stalemate, the Court held a conference. During this conference, Group misstated that the Court had previously stated that the preliminary injunction hearing would proceed without discovery. The Court corrected this misstatement and admonished the parties to meet and confer productively and professionally. Specifically, the parties were to inform the Court of any unresolved discovery disputes by June 8, 2020.

53.     Although Technologies offered to extend Group's time to respond to its outstanding discovery requests, Group did not timely respond. When Group responded roughly four months after it received the requests, it produced a handful of documents without objections.

54.     Despite Technologies' request for "business plans and/or investor materials referring to or relating to THEIA or a THEIA-formative mark," Group produced a single such document. Pl.'s Hr'g Ex. 25 at 5; Ex. 28 at 1. Group's 30(b)(6) corporate representative, however, had testified that many such other documents were given to potential partners or investors. Hr'g Tr. Day 1 at 117:10-118:20; *see also* Hr'g Tr. Day 2 at 36:18-37:18.

55.     Likewise, Technologies requested documents "referring or relating to launch dates for Defendants' satellite network, including any changes to such launch dates and the reasons for

---

[27]     Certain of these discovery disputes are recounted in the Court's prior ruling on Technologies motion to compel. *Theia Techs. LLC v. Theia Grp., Inc.*, No. CV 20-97, 2020 WL 6450468 (E.D. Pa. Nov. 3, 2020). The Court considers Group's intransigence in discovery practice as further restricting what is already a limited factual record given the procedural posture of this case.

38

such changes or dates." Pl.'s Hr'g Ex. 25 at 5. Group responded "None" existed. This response was contradicted by Group's 30(b)(6) corporate representative who testified that he was responsible for the launch schedule and that responsive documents did exist. *See* Fargnoli Depo. Tr. at 103:11-14, 106:14-108:4.

56.    Group's 30(b)(6) corporate representative was unprepared to testify to a number of topics included in Technologies' deposition notice. Instead, he deferred to Group's corporate secretary, whose deposition had been scheduled for later that week. Hr'g Tr. Day 1 at 121:8-122:3, 131:14-25; Hr'g Tr. Day 2 at 30:6-31:4; Pl.'s Hr'g Ex. 31 (Gallagher 30(b)(1) notice).

57.    Shortly after the 30(b)(6) deposition, Technologies requested the relevant materials discussed during the deposition and demanded corrective action for Group's unprepared corporate witness. Group produced an additional investor document, withheld all other documents, and agreed to make Group's corporate secretary available to testify on limited topics.

58.    Group later produced a handful of additional contracts which were heavily redacted and marked HIGHLY CONFIDENTIAL under the terms of the parties' protective order.

**I.  The Parties' Respective Harm**

59.    Technologies' President, Mr. Gohman, testified that the company will be harmed by losing control of its mark absent a preliminary injunction. Technologies has cultivated its business reputation over the past 14 years of brand-building around the THEIA mark. It uses the mark on all of its products. Hr'g Tr. Day 1 at 42:22-25.

60.    Mr. Gohman testified that, regardless of whether Group succeeds or fails in building a satellite network and whether it has the capital it indicates it has, Technologies will be harmed by association with Group. Hr'g Tr. Day 1 at 62:25-64:13. Group will continue to expand its footprint—and use the mark commensurately—as the case proceeds to trial absent an

39

injunction. *Id.* at 66:2-10. This is especially troubling to Technologies because the nature of Group's business can—and has—garnered negative press.

61.     Mr. Gohman testified that an immediate loss to his company flows from Group's international registration that is currently blocking Technologies' Japanese application. Hr'g Tr. Day 1 at 31:23-32:7, 33:8-13. And, in the meantime, Technologies is concerned about its ability to secure future investors for its products if no injunction issued. *Id.* at 66:11-16.

62.     As for Group, Mr. Gallagher testified on its behalf that a preliminary injunction might jeopardize Group's highly classified contracts with sovereign nations. The basis for this potential harm was not explained other than as a matter of "common sense." Hr'g Tr. Day 2 at 51:10-16.

63.     Mr. Gallagher further testified that Group would not lose its licenses if it had to change its name. Hr'g Tr. Day 2 at 47:24-48:3. Mr. Gallagher did not know what the name-change steps were, how long it would take, or how much it would cost Group to change its name. *Id.* at 48:11-14.

64.     Group does not discuss its intellectual property with its investors. But at least one investor indicated it would not withdraw its investment because of this suit. Hr'g Tr. Day 2 at 44:24-45:25.

65.     A name change would not delay Group's launch date. Hr'g Tr. Day 2 at 51:22-52:7. The THEIA satellite network is not currently in space and Group does not have any goods branded THEIA. *Id.* at 52:14-21.

66.     Group frequently refers to the THEIA satellite network as the "TSN" and could continue to do so if it were enjoined from using THEIA. Hr'g Tr. Day 2 at 52:22-53:6.

## II.    Conclusions of Law

67.    In ruling on a request for a preliminary injunction, a district court is required to examine four factors:  (1) the plaintiff's likelihood of success on the merits;  (2) whether the plaintiff will suffer irreparable harm if relief is not granted; (3) the balance of equities; and (4) the public interest.  *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 191–92 (3d Cir. 1990). The movant must "meet the threshold for the first two 'most critical' factors," and if "these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).

### A. Likelihood of Success on the Merits

68.    A likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not . . . ."  *Reilly*, 858 F.3d at 179.

69.    To succeed on the merits of its Lanham Act claims, Technologies "must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).  The same standard applies to unfair competition claims brought pursuant to § 43(a) of the Lanham Act, *see id.*, and common law infringement claims.  *See First Am. Mktg. Corp. v. Canella*, No. 03-812, 2004 WL 250537, at *2 (E.D. Pa. Jan. 26, 2004) (listing elements of common law trademark infringement claim).

## 1. Validity, Legal Protectability, and Ownership

70.     Under the Lanham Act, a federally registered trademark is "prima facie evidence of the validity of the registered mark[.]" 15 U.S.C. § 1115(a). Furthermore, "validity, legal protectability, and ownership are proved" when "the mark at issue is federally registered and has become incontestable." *Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

71.     An incontestable trademark thus satisfies the first two prongs of a trademark infringement claim. "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 n.7 (3d Cir. 1994); 15 U.S.C. § 1065. The conclusive presumption of ownership established by an incontestable registration can be challenged under a limited number of circumstances, none of which Group contends are applicable here. 15 U.S.C. § 1115(b)(1)-(9) (listing defenses or defects in incontestable registrations such as fraud, abandonment, and that the mark is functional).

72.     In this case, Technologies' '019 Registration for the word mark THEIA for lenses and optics is incontestable. Pl.'s Hr'g Ex. 3; Hr'g Tr. Day 1 at 24:22-26:4. So, the first two elements of Technologies' infringement and unfair competition claims are met as to the THEIA mark registered as the '019 Registration.

73.     Technologies' '657 Registration for THEIA for software relating to lenses and optics is *prima facie* evidence of Technologies' ownership of the mark. 15 U.S.C. § 1115(a).[28]

---

[28]     At the time Technologies submitted its proposed findings of fact and conclusions of law, the '657 registration had not yet been in continuous use for five years. The five-year mark has recently passed,

74.     When a Registration is not yet incontestable, its "validity depends on either inherent distinctiveness or proof of secondary meaning." *Fisons*, 30 F.3d at 472. "A mark is inherently distinctive if it may be fairly characterized as arbitrary . . . or suggestive." *Com. Nat'l Ins. Servs.*, 214 F.3d at 438. "Courts classify the distinctiveness or conceptual strength of a mark as either (1) generic, like 'Diet Chocolate Fudge Soda'; (2) descriptive, like 'Security Center'; (3) suggestive, like 'Coppertone'; or (4) arbitrary or fanciful, like 'Kodak.'" *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184 (3d Cir. 2010). Arbitrary or fanciful marks neither describe nor suggest anything about the product, while suggestive marks require consumer imagination to determine the nature of the product. *Id.* Generic and descriptive marks are not eligible for trademark protection. The other two categories, however, are deemed inherently distinctive and thus entitled to protection. *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 768 (1992).

75.     Because the THEIA mark registered in the '657 Registration is either arbitrary or suggestive, the mark is a valid, legally protectable mark, without any proof of secondary meaning required. Group did not introduce any evidence to rebut this conclusion.

76.     Because Group does not challenge the incontestability of the registered marks, "validity, legal protectability and ownership" are proved as to Technologies' marks. *Com. Nat. Ins.*, 214 F.3d at 438.

## 2. Likelihood of Confusion

77.     "A likelihood of confusion exists when a consumer viewing the mark would probably assume that the product or service it represents is associated with the source of a

---

around the time the parties submitted their supplemental briefing. Although Technologies referred to its marks as "incontestable" in its October submissions, Doc. No. 54 at 6, the Court will not assume the mark is incontestable absent evidence in the record.

43

different product or service identified by a similar mark." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2010) (internal quotation marks omitted). "Likelihood of confusion under the Lanham Act is not limited to confusion of products. Confusion as to source is also actionable." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 711 (3d Cir. 2004).

### i. *Reverse Confusion*

78.     There are two forms of "likelihood of confusion" claims—"direct confusion" and "reverse confusion."[29]  This case implicates the latter doctrine.

79.     Reverse confusion is a distinct basis for a Lanham Act claim. *A & H*, 237 F.3d at 227-28. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons*, 30 F.3d at 447.  The harm stems from the public's misperception that the senior owner's products really are the junior's, or there is some connection forged between the two.  Thus, the confusion dilutes the value of the senior owner's trademark: "its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *A & H*, 237 F.3d at 228 (quoting *Ameritech, Inc.*, 811 F.2d at 964) (alterations in original).  Reverse confusion protects David's trademarks against an encroaching Goliath. *Id.* (quoting *Fisons*, 30 F.3d at 475).

80.     The Third Circuit Court of Appeals outlined a non-exhaustive list of ten factors—the *Lapp* factors—to determine the likelihood of confusion in a "direct confusion" Lanham Act case. *Interspace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983).  The appellate

---

[29]     The essence of a direct confusion claim is a junior user tries to "free-ride" off the reputation and good will of the established senior user by use of a similar or identical mark. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

court has since held that the *Lapp* factors likewise apply in cases alleging reverse confusion. *A & H*, 237 F.3d at 208. Certain of the factors, however, are modified slightly when the overriding concern is whether a larger junior user is attempting to usurp—or indeed is usurping—the senior user's mark and associated goodwill. Accordingly, the following *Lapp* factors reflect the test for reverse confusion:

> (1) the degree of similarity between the owner's mark and the allegedly infringing mark;
>
> (2) the strength of the owner's mark, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;
>
> (3) the price of the goods and other factors indicating the care and attention one expects would be given when making a purchase;
>
> (4) the length of time the alleged infringer has used the mark without evidence of actual confusion arising;
>
> (5) the intent of the alleged infringer in adopting the mark;
>
> (6) the evidence of actual confusion;
>
> (7) whether the goods, competing or not competing, are marketed through the same channels or trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of consumers, whether because of their near-identity, similarity of function, or other

factors; and

(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

*A & H*, 237 F.3d at 234.

81.     The *Lapp* factors "can be applied to both competing and noncompeting goods." *All. Bank v. New Century Bank*, 742 F. Supp. 2d 532, 555 (E.D. Pa. 2010) (citing *A & H*, 237 F.3d at 213).

82.     Because the inquiry is "qualitative" and highly fact dependent, not all *Lapp* factors are necessarily relevant; nor are the factors necessarily accorded equal weight. *A & H*, 237 F.3d at 215.

83.     Once having considered each of the relevant *Lapp* factors, the Court must then determine whether the totality of the circumstances support a finding that marketplace confusion is likely. *All. Bank*, 742 F. Supp. 2d at 565 (internal quotation omitted).

*ii. Factor 1: Similarity of the Marks*

84.     The most critical factor in determining likelihood of confusion is "mark similarity." That is, whether "the labels create the same overall impression when viewed separately." *A & H*, 237 F.3d at 216 (internal quotation marks and citations omitted). The test is satisfied when an ordinary consumer is likely to think that the products "share a common source, affiliation, connection or sponsorship.'" *Id.* (citation omitted). And, when the marks are identical—as they certainly are here—there is no contest because the "likelihood of confusion is

46

inevitable." *Pappan Enters., Inc. v. Hardees Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998).

85.     Technologies' registered mark is THEIA.     Because the '019 and '657 Registrations are both for word marks, they are not limited to any particular design or form of the mark. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 949-50 (Fed. Cir. 2000) ("Registrations with typed drawings are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce."); *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 970 (10th Cir. 2002) (noting that the plaintiff's "mark is typed in capital letters in the principal trademark register, which means that the registration covers all design features and is not limited to any special form or lettering").

86.     Group has adopted and used the identical THEIA word mark on its website, which is used in part to "pitch" to potential investors or "partners, in its investor/partner pitch materials, and at trade shows and industry events. Pl.'s Hr'g Ex. 15-19; Hr'g Tr. Day 2 at 34:21-23, 35:4-7, 35:15-36:10; Defs.' Hr'g Ex.11. These activities are sufficient to demonstrate use of THEIA in commerce under the Lanham Act to support an infringement action. *See Orthovita, Inc. v. Erbe*, No. CIV.A. 07-2395, 2008 WL 423446, at *13 (E.D. Pa. Feb. 14, 2008) (holding that an offer to sell without more was sufficient to establish liability); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 345-46 (D. Del. 2019) (finding it "immaterial" that defendant did not sell products "because liability under the Lanham Act can be based on advertising and promotion alone" and defendant's website contained contact information and "was not non-commercial speech").

87.     The Court rejects Group's argument that Technologies' occasional use of the word "Technologies" with its THEIA mark contradicts or undermines the finding that the marks

47

are identical.[30]

88.     Similarly, Group's efforts to create meaningful differences because they are displayed differently, to coin a phrase, miss the mark. "When the dominant portions of the two marks are the same, confusion is likely." *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991); *see also MedAvante, Inc. v. ProxyMed, Inc.*, No. CIV.A.06 3248 MLC, 2006 WL 2927623, at *7 (D.N.J. Oct. 12, 2006) (rejecting argument that marks were not substantially similar because "[t]rademark infringement does not require exact copying of the trademark as the owner uses it" (quoting *Fisons*, 30 F.3d at 477)). So, Group's argument that its logo form of the mark includes a "T" and a globe design is irrelevant. THEIA is plainly by far the dominant portion of its design mark and it is therefore proper to give the THEIA portion greater force and effect. *Country Floors*, 930 F.2d at 1065.

89.     Because Group uses an identical THEIA mark, the mark similarity factor weighs heavily in favor of finding likelihood of confusion. *See, e.g., Maya Swimwear, Corp. v. Maya Swimwear, LLC*, 789 F. Supp. 2d 506, 514 (D. Del. 2011) (finding factor favored plaintiff where defendant used identical mark); *MedAvante*, 2006 WL 2927623, at *7 (same).

### iii. Factor 2: Strength of the Mark

90.     The strength of the mark is determined by the "inherent features of the mark contributing to its distinctiveness or conceptual strength" and the "commercial strength or marketplace recognition of the mark." *Sabinsa*, 609 F.3d at 184-85.

---

[30]     This argument fails for multiple reasons. First, Technologies does not always use THEIA with "Technologies." *See* Pl.'s Hr'g Ex. 10; Defs.' Hr'g Ex. 20; Hr'g Tr. Day 1 at 41:1-23. Second, it should be obvious that the introduced uses of THEIA with "Technologies" still constitute use of the mark THEIA. *See Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991).

91.     As to the first feature—the distinctiveness or conceptual strength of Technologies' THEIA mark—the Court has already found the mark to be arbitrary or fanciful (if not suggestive). *See supra* Section II.A.1.

92.     Group previously acknowledged that the THEIA mark is "not descriptive of goods and services." The Court agrees. The word "Theia"—albeit the name of the Titan goddess of sight—provides no further insight into either of Technologies' or Group's products. On this basis, the Court finds that Technologies' THEIA mark is conceptually strong—a feature which weighs in its favor.

93.     In a reverse confusion case, "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." *Com. Nat'l Ins. Servs.*, 214 F.3d at 444. Instead, the Court considers the commercial strength of Group and an advertising or marketing campaign that has resulted in a saturation in the public awareness of the mark. *A & H*, 237 F.3d at 231 (citing *Fisons*, 30 F.3d at 474, 479). The junior user's *ability* to saturate the market—even if it has yet to happen—is relevant. *Id.* at 445.

94.     The commercial strength prong also weighs in favor of Technologies. Group's commercial strength and resources—including available capital to deploy in advertising—dwarfs Technologies'. Indeed, Group testified that it expects to be the largest, most valuable company in the world in the next decade. Hr'g Tr. Day 2 at 33:4-16. And it anticipates that its reach will "not be unlike Apple." *Id.* at 40:16-22. By contrast, Technologies has made approximately $77 million in sales in the past 11 years. Hr'g Tr. Day 1 at 43:1-4. Technologies is a four-member LLC, *id.* at 66:24-25, compared to Group's hundred-plus employees—and counting, Hr'g Tr. Day 2 at 31:23-32:3.

49

95.     Despite Group's professed efforts to remain "discreet," the Court cannot overlook its potential—and stated intention—to saturate the marketplace. *Com. Nat'l Ins. Servs.*, 214 F.3d at 445 (finding junior user's use of mark will result in reverse confusion by virtue of its greater ability to promote the mark). Group is undoubtedly a larger company with superior resources and economic strength (not to mention its unabashed expression of its intent to become one of the most valuable companies in the world).

96.     Group's "crowded field" argument does not alter the Court's findings. The Court is not persuaded that third-party use of the mark has much—if any—probative value here.

97.     To be sure, a mark may be weakened when there are many similar marks in a crowded field. *See Accu Pers., Inc. v. AccuStaff, Inc.*, 823 F. Supp. 1161, 1166 (D. Del. 1993). But the mere existence of third-party registrations for other THEIA marks does not dilute the strength of the mark absent evidence of the third party uses. The record does not include evidence of actual use of these third-party marks. 2 McCarthy on Trademarks and Unfair Competition § 11:89 (5th ed. 2020) (discussing the general rule that registrations alone are not evidence of third-party use); *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1338 (Fed. Cir. 2008) (same).

98.     Moreover, the registrations that Group cites are for unrelated goods and services, including for business management software, medical analytic software, and estate management software. Because the alleged third-party use is for dissimilar goods, Group's claim that the THEIA mark has been weakened is not persuasive. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) (third-party use is indicative of mark weakness when similar marks are used for similar goods).

99.     Comparing Group's commercial strength—and accounting for its resources to promote it—with that of Technologies suggests that confusion is likely.

*iv. Factor 3: Care and Attention Expected of Customers*

100.    This factor focuses on "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." *Lapp*, 721 F.2d at 463. The first step is identifying the standard of care consumers use when purchasing the product. Generally, consumers devote less care selecting inexpensive goods. Professional buyers are held to a higher standard of care. But when a product is purchased by both ordinary and professional consumers, the applicable degree of care reverts to that of the "least sophisticated consumer" in the class. *McNeill Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 363-64 (3d Cir. 2007).

101.    Here, both parties target sophisticated parties and potential buyers such as sovereign nations, government entities, and industrial companies. *See, e.g.*, Hr'g Tr. Day 1 at 13:1-8; Hr'g Tr. Day 2 at 40:5-15, 40:24-41:2; Pl.'s Hr'g Ex. 18 at 3, 4-5; Pl.'s Hr'g Ex. 20 at 1-2. So, Group contends that, because these industrial and government consumers exercise a great deal of care, confusion is unlikely.

102.    There are at least two flaws to Group's arguments. First, even when consumers are sophisticated, their expertise as to products does not "obviate confusion as to source or affiliation." *Kos Pharm.*, 369 F.3d at 717 ("It is well settled that expertise in the field of trademarks cannot be inferred from expertise in another area."). So, Technologies raises a colorable argument that use of the mark on competing products may lead consumers to believe that the companies are affiliated. This is bolstered by the fact that Technologies manufactures components of satellites—bearing the THEIA mark—whereas Group is planning to launch satellites—likewise with the THEIA mark.

103.    Second, both companies also target individual hobbyists (including Group's anticipated industrious teenager who develops an algorithm to count whales). Because the

51

purchasing group is a "combination of professional and ordinary consumers, the class as a whole is not held to the higher standard of care." *Sabinsa*, 609 F.3d at 186. So, the appropriate standard is decidedly not that of a sovereign nation.

104.    But, even so, the Court finds that this factor does not weigh heavily in favor of either party. Although the appropriate standard of care is the general individual hobbyist, Technologies' individual lenses are sufficiently expensive to not be considered an "impulse-purchase." *See, e.g.*, *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 467 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013) (finding that a consumer would exercise "a great deal of care" before purchasing a gaming sensor that costs at least $150). Although Technologies' lowest priced lens costs approximately $65, the typical retail price ranges between $300 and $500. Hr'g Tr. Day 1 at 18:14-17. It is not a rash conclusion to find here that even the individual purchaser will exercise a non-negligible degree of care in purchasing the lenses.

### v. Factors 4 & 6: The Length of Time Defendant has Used the Mark and Evidence of Actual Confusion

105.    The Court addresses the *Lapp* factors dealing with "actual confusion" together. Evidence of actual confusion is not essential to a plaintiff's case, although it certainly strengthens the claim. *Fisons*, 30 F.3d at 476. By contrast, when the parties have concurrently used similar marks without evidence of consumer confusion, the Court can infer that future consumers too are unlikely to be confused. *Kos Pharm.*, 369 F.3d at 717 (quoting *Fisons*, 30 F.3d at 476). For purposes of a preliminary injunction, Technologies "need only show a likelihood of confusion, not actual confusion." *All. Bank*, 742 F. Supp. 2d at 563.

106.    Group adopted the THEIA mark in 2015 but did not begin publicly displaying the mark until October 2019. Hr'g Tr. Day 2 at 43:17-19, 33:22-34:20, 33:22-24. At the time of the hearing, roughly eight months had passed from the start of public display. This amount of time

52

appears to be the tipping point for what constitutes enough time to favor either party. At least one court within this Circuit found that one year of overlapping use of the mark without actual confusion favored the defendant. *Vynamic, LLC v. Diebold Nixdorf, Inc.*, No. CV 18-577, 2019 WL 193660, at *8 (E.D. Pa. Jan. 15, 2019). Even still, "[o]ne year is not an exorbitant amount of time." *Id.* At the other end of the spectrum, four and six months of concurrent mark use without actual confusion were considered too short a timeframe to favor the defendant. *All. Bank*, 742 F. Supp. 2d at 561 (four months); *Fisons*, 30 F.3d at 476 (six months). In this case, the Court gives this fourth factor little ultimate weight in the analysis.

107. To the extent the fourth factor could favor Technologies, it is because it has introduced a single instance of actual confusion. Mr. Gohman testified about a sales call on June 25, 2020 from a supplier. The caller inquired into the relationship between Group and Technologies, whether they were the same company, and if not, why they both used the same name. Hr'g Tr. Day 1 at 60:7-61:18; Pl.'s Hr'g Ex. 32. The inquiring supplier learned that there were two different companies only when Mr. Gohman so informed him. Hr'g Tr. Day 1 at 87:11-15.

108. Group challenges the admissibility and the weight of Mr. Gohman's testimony. The Court has considered and will reject both attacks on the evidence but finds that the evidence of actual confusion to be limited to this isolated incident.

109. First, the Court considered the evidentiary status of Mr. Gohman's testimony, which Group suggests is anecdotal hearsay otherwise uncorroborated by contemporaneous notes taken during the phone call. Group did not advance any hearsay objections during the hearing. The Court finds Mr. Gohman's testimony to be credible for purposes of ruling on Technologies' motion for preliminary injunction. "[A] preliminary injunction is customarily granted on the basis

of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Kos Pharm.*, 369 F.3d at 718 (internal citation omitted). To that end, the Court may rely on hearsay materials that would otherwise be deemed inadmissible.

110.     Second, it is legally irrelevant that this instance of actual confusion was not by a consumer because "[t]he likelihood of confusion with which the Lanham Act is concerned is not limited to confusion of products among purchasers." *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 321 (3d Cir. 2015); *see also Kos Pharm.*, 369 F.3d at 708 (Lanham Act extends to "the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin"). Because the concern is "protect[ing] the manufacturer's reputation," evidence of confusion also includes "confusion among nonpurchasers," including suppliers. *Arrowpoint*, 793 F.3d at 321.

111.     Proof of actual confusion—which appears here—is "often deemed the best evidence of possible future confusion." *All. Bank*, 742 F. Supp. 2d at 563. To be sure, the evidence here is relatively weak because it involves only a single example of confusion by a corporate representative. *See, e.g.*, *A & H*, 237 F.3d at 227. Nevertheless, the Court ought not adopt a blanket disregard Mr. Gohman's testimony. The Court considers this one instance in the mix. Accordingly, the sixth factor weighs slightly in favor of the preliminary injunction.

112.     This finding is not altered despite Technologies' failure to conduct a "confusion survey," although its effect is to deprive the Court of additional evidence. At least one court within this Circuit (albeit not in this district) has emphasized that a plaintiff's failure to conduct a confusion survey when it was financially able weighed against a request for a preliminary injunction. *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 373 (D.N.J. 2002). *Pharmacia* is distinguishable on its facts. There, the plaintiff had conducted numerous studies



involving the contested mark but never evaluated whether the mark would cause confusion with

defendant's mark. So, the Court drew a negative inference from the puzzling lack of evidence.

Here, there is no evidence that Technologies has ever invested in a confusion study or similar

market research of its mark. Moreover, the Third Circuit Court of Appeals has emphasized that

while a consumer survey is a sufficient—indeed preferred—method of establishing the likelihood

of confusion, it is not a necessary one. *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,

921 F.2d 467, 476 (3d Cir. 1990). This Court declines Group's invitation to infer that Technologies

believed the results of a survey—a survey that it never conducted—would be unfavorable.

### vi. Factor 5: Intent of Defendant

113.    In a reverse confusion case, "intent to confuse is unlikely to be present" but not

improbable. *A & H*, 237 F.3d at 232; *Com. Nat'l Ins. Servs.*, 214 F.3d at 445. That is because the

intent inquiry in a reverse confusion cases focuses on the junior user's "deliberate intent to push

the senior user out of the market" rather than the junior user's intent to exploit or piggyback off

the senior user's goodwill. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 479 (3d

Cir. 2005).

114.    To the extent deliberate intent exists in a reverse confusion case, the focus is on

whether "the defendant was aware of the senior user's use of the mark in question, or whether [it]

conducted an adequate name search for other companies marketing similar goods or services under

that mark." *Com. Nat'l Ins. Servs.*, 214 F.3d at 444. The Third Circuit Court of Appeals has

clarified, however, that "mere carelessness" is not the standard for finding deliberate intent in a

reverse confusion case. *Freedom Card*, 432 F.3d at 480.

115.    Constructive knowledge of marks exists as of the date the mark is registered.

*Teledyne Techs. Inc. v. W. Skyways Inc.*, 78 U.S.P.Q.2d 1203, 1210 & n.10 (TTAB 2006).

Technologies' THEIA mark for lenses and optics ('019 Registration) registered July 22, 2008, and

its THEIA mark for software ('657 Registration) registered October 20, 2015. Pl.'s Hr'g Ex. 2, 4. The applications for both registrations were publicly available through the USPTO's database even earlier. *Id.* Technologies' website was publicly available as early as 2006. Hr'g Tr. Day 1 at 42:10-13.

116.    But Group searched only the Delaware Secretary of State's corporate database before adopting the THEIA mark in 2015. It did not conduct a U.S. Patent and Trademark Office search in 2015. Hr'g Tr. Day 2 at 43:23-44:4. Although some sort of search was completed in 2017, Group withheld any additional details about later searches based on attorney-client privilege. *Id.* at 44:5-13.

117.    Group's failure to conduct an adequate search of the THEIA mark before adopting it weighs in Technologies' favor. At a minimum, Group was careless in performing a limited cursory search for Delaware businesses, particularly when Group conducts (or plans to) business worldwide. *Fisons*, 30 F.3d at 480 (finding requisite intent because "while [junior user] may have acted innocently, [it] was careless in not conducting a thorough name search" before adopting the mark). Carelessness seems to this Court too charitable a characterization of Group's conduct on this point.

118.    Technologies presents evidence that goes beyond carelessness. Technologies' August 2019 letter provided Group with actual knowledge of Technologies' registrations and use of the THEIA mark. *See* Pl.'s Hr'g Ex. 14. Group did not respond to it or follow-ups. Hr'g Tr. Day 1 at 51:4-11. Moreover, after receiving this letter, Group persisted in using THEIA— launching its website using the THEIA mark in late October 2019 and further investing in the THEIA mark. Hr'g Tr. Day 2 at 47:1-9. Given Group's notice of potential infringement, the Court will not find Group "blameless." *Kos Pharm.*, 369 F.3d at 721 (citing *Telechron, Inc. v. Telicon*

*Corp.*, 198 F.2d 903, 908 (3d Cir. 1952)). Such conduct pushes Group out of the realm of mere carelessness.

119.    Group counters that it did not have an intent to confuse because it believed the parties served different markets. *See Freedom Card*, 432 F.3d at 479. Similar marks used in separate markets will undermine a finding of a junior user's intent to push the senior user out of the market. But its argument is undermined by its adoption of the mark without any evaluation of competing uses of it. *Cf. MedAvante*, 2006 WL 2927623, at *11 (although junior user was aware of the senior user's mark at the time of adoption, there was no evidence to indicate it was careless in evaluating a likelihood of confusion). This argument does not carry the day.

120.    Nor can Group rely on the USPTO's actions to negate a finding of deliberate intent. The USPTO allowed Group to file its applications despite Technologies' THEIA registrations. That the examining attorney allowed Group's applications "need not be given weight when the PTO attorney did not review all the evidence available to the District Court." *A & H*, 237 F.3d at 221; *see also Kos Pharm.*, 369 F.3d at 714-15 (rejecting argument that USPTO's allowance showed no likelihood of confusion because "the record does not show that the PTO actually considered the registerability of [defendant's mark] over [plaintiff's mark], much less that it found the marks not to be confusingly similar"). Here, there is no evidence demonstrating that the examining attorney reviewed any evidence of Technologies' marks or registrations when reviewing Group's applications. So, the Court need not give weight to the USPTO's allowance of Group's applications.

121.    Nevertheless, deliberate intent is challenging to establish in the reverse confusion context. The record does not support a finding that Group sought to push Technologies out. Indeed, Group paid the smaller senior user no heed. Although its conduct could be construed as

reckless, the Court finds that it does not rise to the requisite level of deliberate intention to confuse consumers, necessary in order for this factor to weigh in Technologies' favor.

> *vii. Factor 7:  Whether the Goods and Services Are Marketed Through the Same Channels*

122.    When the parties use similar marketing and advertising campaigns, there is a greater likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 288-89 (3d Cir. 2001).  "[T]rade exhibitions, publications [,] other media the parties use in marketing their products" and the use of sales forces to reach consumers are all relevant here. *Id.* at 289.

123.    Here, the parties' marketing and advertising channels overlap.  In addition to marketing and advertising through their respective websites, they also conduct in-person meetings, and attend or sponsor trade shows or industry forums.  Hr'g Tr. Day 1 at 38:17-20, 18:20-24, 126:5-19, 96:7-97:2; Hr'g Tr. Day 2 at 34:21-23, 35:4-7, 35:15-36:10.

124.    Group attempts to distinguish between the parties' use of their websites.  It contends that it uses its website only to market to sophisticated consumers—such as sovereign nations or potential investors—whereas Technologies' website is allegedly directed to less sophisticated purchasers.  But the Third Circuit Court of Appeals has expressly rejected customer sophistication as relevant to determining whether the goods are marketed through the same channels.  *Kos Pharm.*, 369 F.3d at 723.  That is because other *Lapp* factors consider customer sophistication.  The Court thus declines Group's request to impermissibly conflate *Lapp* factors.

125.    Group also argues that it does not advertise on its website and instead solicits inquiries from "qualified, interested parties."  It is true that its website does not display any pricing information.  But there is no requirement that Group's promotional materials—which the Court finds the website to be—is not considered an advertisement for its company and services.  *New*

58



*Balance Athletics, Inc.*, 424 F. Supp. 3d at 345 ("billboards, print ads in fashion magazines, product placements in movies, and the sponsored wearing of items by celebrities and influencers" may not contain pricing information but are nevertheless commercial speech).

126.    To be sure, the Court assigns minimal weight to the mere fact that both parties offer goods, services, and solicit inquiries on the Internet. This factor would be too easily satisfied if presence on this "pervasive medium" is all that is necessary. 4 McCarthy on Trademarks and Unfair Competition § 24:53.50 (5th ed. 2020).

127.    But the record also supports that both parties conduct in-person meetings and attend events with their customers or contacts in the defense and national security industries. Hr'g Tr. Day 1 at 18:6-9; Hr'g Tr. Day 2 at 35:15-36:10. This overlap weighs in favor that confusion may be likely—even if Technologies was not invited to the two events that Group has sponsored.

128.    Because of the shared channels of trade and advertising, the Court concludes that this factor favors finding a likelihood of confusion.

### *viii. Factor 8: The Extent to Which the Target Markets are the Same*

129.    A stronger likelihood of confusion exists "when parties target their sales efforts to the same consumers." *Checkpoint Sys.*, 269 F.3d at 289. The target markets need not be identical for this factor to support a finding of likelihood of confusion. *See, e.g.*, *MedAvante*, 2006 WL 2927623, at *10 (finding targets sufficiently related where both parties were in healthcare industry and both met doctors in hospital and office settings). Group's emphasis on the hobbyists who purchase Technologies' products through retail distributors overlooks the overlap in the highly valued target consumers in the same industries, including universities, insurance, military, space, security and surveillance, agriculture, and earth monitoring. *See, e.g.*, Hr'g Tr. Day 1 at 5:11-13, 12:1-7, 13:13-18, 14:17-20, 14:24-16:14, 16:24-17:25, 18:6-9, 37:18-38:4, 84:19-22; Hr'g Tr. Day

2 at 28:11-20, 38:25-39:14, 42:10-18; Pl.'s Hr'g Ex. 18 at 4-5; Pl.'s Hr'g Ex. 20 at 1-2.

130. Moreover, although Group initially focused its marketing efforts on sovereign nations to secure the build-out funds for its satellite network, it admits that vast majority of its expected revenue will come from major industries and individual consumers alike. Hr'g Tr. Day 2 at 39:19-22, 40:5-15, 40:24-41:2, 42:19- 43:12. Thus, the Court finds this factor weighs in favor of likelihood of confusion.

### ix. Factor 9: Relationship of the Goods in the Minds of Consumers

131. When considering this factor, "the question is not whether it is possible to distinguish between the products but whether, and to what extent, the products seem related, whether because of [their] near-identity, . . . or similarity of function, or other factors." *Kos Pharm.*, 369 F.3 at 723 (internal quotation marks and citation omitted). Courts may consider "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source[,] affiliation or sponsorship." *Checkpoint Sys.*, 269 F.3d at 286. Moreover, the goods and services need not be identical. *Kos Pharm.*, 369 F.3d at 723; *A & H*, 237 F.3d at 224 (affirming that relatedness of the goods factor favored plaintiff where products were only "somewhat interchangeable" due to "slightly different functions").

132. Because this is a reverse confusion case, it is appropriate to consider whether a reasonably prudent consumer would see Group's goods and services and assume the same source also offers Technologies' goods and services. *See Fisons*, 30 F.3d at 481. Group's use of optics, or lenses, to obtain imaging data and the sale of that data manipulated by software is sufficiently related to Technologies' optics and software for analyzing data obtained from optics. For example, Technologies' lens technology is currently used on a spacecraft flown by the Japanese Space Agency JAXA and was flown by NASA on the "Global Hawk" drone used to monitor weather

60

events. So, there is evidence that it is already used as a component part on satellites and on devices to study "atmospheric sciences," which is one of the industries that Group intends to penetrate.

133.    Moreover, the name "Theia *Group*" suggests the existence of other Theia subdivisions handling various aspects of Group's goods and services—which is indeed the case. Even though Group produces and operates satellites—and not the lenses used on satellites as Technologies does—it is not unreasonable for a consumer to conclude that a company that produces satellites may produce the component parts too. This is especially true given Technologies' name suggests that it manufactures the technology itself.

134.    The parties' goods and services need not be identical, as is the case here, for this factor to favor finding a likelihood of confusion. *Alfred Dunhill of London, Inc. v. Kasser Distillers Prod. Corp.*, 350 F. Supp. 1341, 1352 (E.D. Pa. 1972), *aff'd*, 480 F.2d 917 (3d Cir. 1973) ("Goods are related if they are used in conjunction with one another or are associated together in some way in the minds of the consuming public."). Instead, the likelihood of association between the part and the whole of a satellite is compelling evidence that weighs in Technologies' favor.

> *x. Factor 10:  Other Facts Suggest the Public Might Expect the Larger Company to Manufacture Both Products*

135.    The final *Lapp* factor considers the "nature of the products or the relevant market, the practices of other companies in the relevant fields, [and] any other circumstances that bear on whether consumers might reasonably expect both products to have the same source." *Sabinsa*, 609 F.3d at 189. Technologies does not point to additional evidence in the record here on this issue in support of its requested relief. But the scope of this residual factor is captured in the foregoing analysis of the first nine *Lapp* factors, most of which support a finding that Group's use of the THEIA mark creates a likelihood of confusion or is neutral.

*xi. Balancing of Factors*

136.     The Court finds that Technologies has established a likelihood of confusion. The critical factor in this entire exercise—the similarity of the mark (Factor 1)—weighs heavily in Technologies' favor. The marks are identical. Further, the parties overlap in their targeted markets (Factor 8) (although they are not identical) and make use of similar trade channels to reach their targets (Factor 7) (again, with some peripheral distinctions). The relative strength of Technologies' mark (Factor 2) likewise supports a finding of likelihood of confusion. And, a reasonable consumer may likely associate the parties' products (Factor 9), a finding which is buttressed by Group's own name. Although deliberate intent is difficult to establish in a reverse confusion case (Factor 5), this factor weighs slightly in favor of Technologies too.

137.     The length of time factor (Factor 4) is accorded minimal weight because of the amount of time Group has publicly used the mark. So, it favors neither party. But, given the isolated incident of actual confusion, this factor (Factor 6) weighs in Technologies' favor—albeit weakly.

138.     The care and attention of consumers (Factor 3) weighs against Technologies because the relevant purchasers are sophisticated. But because there still may be confusion as to source or affiliation, the factor does not weigh strongly in Group's favor.

139.     On balance, the Court finds that Group's use of the THEIA mark is likely to create confusion and that Technologies is likely to succeed on the merits of its case.

**B. Irreparable Harm to Theia Technologies**

140.     Although the Court finds there is a likelihood of confusion caused by trademark confusion, irreparable injury is no longer presumed in trademark infringement cases. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006); *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 213 (3d Cir. 2014) (adopting *eBay's* reasoning in the patent context to apply

equally to cases arising under the Lanham Act). But even absent the presumption, "the logic underlying [it] can, and does, inform how [courts] exercise [ ] equitable discretion" in infringement cases. *Groupe SEB*, 774 F.3d at 205 n.8.

141.    Actual irreparable injury is not a requirement. A showing of "potential damage to reputation" is sufficient provided the movant makes a clear showing. *Rann Pharmacy, Inc. v. Shree Navdurga LLC*, No. CV 17-1893, 2017 WL 2442975, at *3 (E.D. Pa. June 6, 2017).

142.    In considering whether to grant such relief, the Court is entitled to draw fair inferences from facts in the record. *Groupe SEB*, 774 F.3d at 205.

143.    Equitable considerations warrant granting preliminary injunctive relief to Technologies. There is the risk of likely reputational injury given the nature of Group's business. The THEIA satellite network has already garnered negative press, being touted as "spy satellites." And Group testified that "privacy has always been a concern." Pl.'s Hr'g Ex. 13 at 1; Hr'g Tr. Day 1 at 47:4-7, 48:12-19; Hr'g Tr. Day 2 at 13:13-19. In light of increasing sensitivity to heightened surveillance and concomitant invasions—or threats to—privacy, Group touts the THEIA satellite network's capability to "digitize[e] the entire earth in real time, with simultaneous granularity and scale that is unprecedented." Pl.'s Hr'g Ex. 15 at 3. Science fiction is rife with cautionary tales of digitized panopticons. A misstep risks bringing the network down to earth—concerns that Technologies' reasonably shares.

144.    Although the products do not directly compete, they exist in the same space, so to speak. Group's imaging will be achieved with lenses or optics, nominally the same goods that Technologies sells under the THEIA mark, from satellites likewise bearing the competing THEIA mark. Hr'g Tr. Day 1 at 127:14-25. *See Opticians Ass'n*, 920 F.2d at195 ("[T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control

the nature and quality of the defendant's goods."). The Court cannot ignore the risk of harm that comes from such an association, given Group's stated intentions to become an extraordinarily valuable company.

145.    Moreover, Group's international registration is currently blocking Technologies' Japanese application which has resulted in lost sales abroad. Hr'g Tr. Day 1 at 31:23-32:7, 33:8-13. The Court does not base its finding on a loss of trade in Japan.[31] But such harm abroad provides an additional inference of risk of harm.

## C. Balance of Equities

146.    The Court must also consider the claims of irreparable harm to Group should it issue the preliminary injunction. *Pappan*, 143 F.3d at 805. Irreparable harm to a defendant "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Kos Pharm.*, 396 F.3d at 727.

147.    Group claims that changes to its name may delay its launch date. However, Group fails to provide any actual evidence in support of its alleged harm. *Accord Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."). To the contrary, Group's witness testified that it could "rebound from" a delay to the launch. Hr'g Day 2 at 52:7. So this cannot constitute irreparable harm.

148.    The evidence from the hearing demonstrates only a threat of speculative or theoretical harm to Group. Group's counsel testified that, if it had to change its name, it would not expect to lose investors—although it was concerned about the pending contracts as a matter of "common sense." Hr'g Tr. Day 2 at 51:10-16. But if the Court granted preliminary relief, that

---

[31]    The Court has already expressed that it is not seeking to apply the Lanham Act extraterritorially at this time.

would not entail Group recalling any satellites in orbit because none have yet been launched with the THEIA mark, *id.* at 52:14-21. Nor would Group lose any of its licenses, *id.* at 47:24-48:3. And, Group admits that it refers to its satellite network as "TSN" and could continue to do so if enjoined. *Id.* at 52:22-53:6.

149.    Moreover, much of Group's speculative woes are traceable to its own inaction. Group neglected to run a trademark search in 2015; there is no evidence of a response to Technologies' August 2019 letter prior to Group's website launch; following notice of this suit, Group continued to fundraise for their project. Injury to a defendant may be "discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). This is to prevent a knowing infringer from defeating a preliminary injunction merely by claiming that the injury would be so severe. So, the Court does not put much stock into Group's concern that an injunction will damage its "credibility." Any regulatory wounds—including a freeze to Group's pending trademark applications—are "self-inflicted." *Juul Labs, Inc. v. 4X PODS.*, 439 F. Supp. 3d 341, 359 (D.N.J. 2020), *appeal dismissed sub nom. JUUL Labs Inc. v. 4x Pods*, No. 20-1490, 2020 WL 5240430 (3d Cir. July 24, 2020).

150.    Further, the cost associated with changing Group's name can be remedied with money damages, if ultimately found appropriate. *Kos Pharm.*, 369 F.3d at 728. Thus, such costs are not considered irreparable harm as a matter of law. *Id.*

151.    After balancing the relative harms to the parties, the Court finds that the balance of harm favors an injunction.

### D. Public Interest Favors such Relief

152.    In a trademark case, the public has an interest in not being "deceived or confused."

65

*Opticians Ass'n*, 920 F.2d at 197; *see also Pappan*, 143 F.3d at 807. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). That is the case here.

153.    To the extent Group contends that its satellite network will be so beneficial that the public interest tips in its favor, such an argument fails. There may well be a public desire for an entirely digitized map of the world at this unprecedented scale. The Court does not weigh in on the speculative social good or ills that may result from such a project. But even adopting Group's position, whatever name Group chose to adopt does not alter its capability to produce and launch satellites and analyze the data gathered. The public's interest at this stage of this litigation is decidedly less galactic—it is only in ensuring that a party does lose control over its brand. Here, the public interest favors Technologies.

## III.    Scope of Injunctive Relief

154.    The Court concludes that Technologies meets "the threshold for the first two 'most critical' factors" of a preliminary injunction: likelihood of success and irreparable harm. *Reilly*, 858 F.3d at 179. Because "these gateway factors are met," the Court also considers the two remaining factors—balance of equities and the public interest. *Id.* Indeed, all four factors tip in Technologies' favor. That is why the Court finds that granting a preliminary injunctive is appropriate here.

155.    Pursuant to Rule 65(c), this Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

65(c); *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.,* 335 F.3d 235, 239 (3d Cir. 2003) ("Generally, a bond is a condition of preliminary injunctive relief."); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 209–10 (3d Cir. 1990) (concluding "that the district court erred in failing to require a bond" when it granted a preliminary injunction).

156.    Given that the Court's ruling will, among other things, enjoin Group from use or registering the THEIA marks, a reasonable bond is required to protect Group's interest. Although Technologies touched on the issue of an appropriate amount for a bond in its proposed findings of fact and conclusion of law, Group did not. Accordingly, the Court will require both parties to submit a brief proposal on the issue of a bond in addition to the reasons that the amount they propose is appropriate.

## IV.    Additional Claim for Trademark Cancellation

157.    Technologies initially moved the Court, among other things, to enjoin Group from registering the mark THEIA and taking any steps to finalize any pending trademark applications for the mark. Doc. No. 2-1. Following the hearing, Technologies also requested that the Court cancel Group's pending U.S. applications for lack of bona fide intent as part of its injunctive relief.[32]  This is because Technologies now asserts that Group's applications are void *ab initio* based on testimony adduced at the hearing.

158.    Technologies requested that the Court also enjoin Group from converting its International Registration into a Japanese national registration once the Court cancelled the U.S. applications.[33]

---

[32]     As a procedural note, Technologies did not move to amend its complaint to include the void *ab initio* claim. It inserted the new grounds for relief in its proposed findings of fact and conclusions of law.

[33]     Technologies also reserved the right to seek a global permanent injunction.



## A. The Cancellation Claim is Mandatory Relief

159.     As an initial matter, the Court must determine whether the new relief requested by Technologies is mandatory or prohibitory, as this also informs Technologies' burden to obtain such relief.

160.     An injunction is mandatory when it either alters the status quo by ordering a positive act or by providing the movant with substantially all the relief sought which cannot be undone even if the defendant prevails at a trial on the merits. *Tri-Realty Co. v. Ursinus Coll.*, No. CIV.A. 11-5885, 2013 WL 5298469, at *12 (E.D. Pa. Sept. 19, 2013) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)). Mandatory injunctive relief is an "extraordinary remedy that is only granted sparingly by courts." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

161.     The party seeking mandatory relief bears a "particularly heavy" burden which requires it to show a substantial likelihood of success on the merits and that its "right to relief is indisputably clear." *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (internal quotations omitted).

162.     But where the relief sought is a prohibitory injunction, a heightened showing is not required. That is because the relief sought maintains the status quo pending a trial on the merits. In a typical trademark case, "a prohibitory injunction seeks to stop alleged infringement." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006).

163.     The nature of the relief being requested, rather than the exact wording of the movant's motion, informs whether the request is for a mandatory injunction. *See Silvertop Assocs., Inc. v. Kangaroo Mfg., Inc.*, 319 F. Supp. 3d 754, 761 (D.N.J. 2018), *aff'd*, 931 F.3d 215 (3d Cir. 2019).

164. The Court finds Technologies' initial request to enjoin Group from using the THEIA mark and affirmatively proceeding with its U.S. trademark applications is textbook prohibitory relief. It does not seek to compel some additional acts by Group. And, as discussed at length, *see supra* Sections I-III, the Court has found Technologies establishes that such relief is warranted.

165. But cancelling a pending trademark application is relief of a different qualitative (and potentially quantitative) nature and goes beyond merely maintaining the status quo.[34]

166. First, Technologies has broadened its requested relief to now seek all or substantially all of its relief at the preliminary injunction stage.

167. Second, the Court at least questions Technologies' argument that if Group eventually prevails on the merits, the cancellation can itself be cancelled. At a minimum, if that were to happen, Group would lose its priority date, currently based on its June 8, 2018 filing date. A later priority date would adversely affect Group's trademark rights as against third parties.

168. The Court concludes that Technologies requests a "mandatory" injunction insofar as it now seeks the cancellation of Group's pending U.S. applications.

169. But the Court is not able to find that Technologies has achieved the heightened showing necessary to warrant the new relief. *See Hope*, 972 F.3d at 320.

## B. The Court's Power to Grant the Relief Requested as a Matter of Law

170. Even if the Court were to credit Technologies' arguments on the purported lack of bona fide intent, the Court cannot find on this preliminary record that Technologies is entitled to such mandatory injunctive relief as a matter of law.

---

[34] It is not clear whether Technologies is asking the Court to order that Group itself affirmatively cancel its own applications. Alternatively, it is possible that Technologies asks the Court to direct the Commission of Patent and Trademarks to cancel the applications.

171.   *First*, the Court questions (and the parties have not adequately addressed) whether it has the jurisdiction to cancel a pending trademark application—let alone to disturb the international registration.

172.   Courts have the power to "order the cancelation of [trademark] registrations" and "otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1119.  Cancellation is a discretionary matter for the court.

173.   Section 1119 of the Lanham Act permits a court to "rectify" the register of a trademark application provided, however, that the applicant is a party to the lawsuit and the application is for a mark "sufficiently related to a registered mark over which the court had jurisdiction." *Somera Capital Mgmt., LLC v. Somera Rd., Inc.*, No. 19CIV8291GHWGWG, 2020 WL 2506352, at *5 (S.D.N.Y. May 15, 2020).

174.   This Court has concurrent jurisdiction with the USPTO to cancel a registered mark when the validity of the mark is challenged in a judicial proceeding. *Ditri v. Coldwell Banker Residential Affiliates*, 954 F.2d 869, 873 (3d Cir.1992).

175.   But neither of Group's challenged applications have yet matured into registrations. The general rule is that a court lacks subject matter jurisdiction to cancel a pending trademark application that has yet to mature into a registration.  5 McCarthy on Trademarks and Unfair Competition § 30:113.50 (5th ed. 2020); *Maduka v. Tropical Nats., Ltd.*, 409 F. Supp. 3d 337, 367 (E.D. Pa. 2019); *Khaled v. Bordenave*, No. 18 CIV. 5187 (PAE), 2019 WL 1894321, at *4 (S.D.N.Y. Apr. 29, 2019). That is because such power is reserved to the Trademark Board by the plain text of § 37 of the Lanham Act.  15 U.S.C. § 1119.[35]  And the operative statutory text discusses only the cancellation of *registrations*.

---

[35]   To be sure, Technologies could petition to cancel the allegedly infringing marks before the USPTO at any time.



176.    Some courts have held that jurisdiction exists to order the cancellation of a yet-unregistered mark in an action where a registered mark is involved as well, provided that the registered mark has a sufficient nexus to the pending application being challenged. *Somera Cap. Mgmt., LLC v. Somera Rd., Inc.*, No. 19CIV8291GHWGWG, 2020 WL 2506352, at *6 (S.D.N.Y. May 15, 2020) (finding jurisdiction over an application that related to a registered mark at issue in the case); *Zany Toys, LLC v. Pearl Enters., LLC*, No. CIV.A. 13-5262 JAP, 2015 WL 404644, at *6 (D.N.J. Jan. 28, 2015); *Cont'l Connector Corp. v. Cont'l Specialties Corp.*, 413 F. Supp. 1347 (D. Conn. 1976); 5 McCarthy on Trademarks § 30:113.50 (recognizing holding in *Cont'l Connector Corp.*). But exercise of jurisdiction in that situation is circumscribed. A court would not reach "unrelated claims for registration of other marks." *Cont'l Connector Corp.*, 413 F. Supp. at 1349. Nor has this Court endorsed this theory of jurisdiction. *Maduka*, 409 F. Supp. 3d at 367.

177.    The Court questions whether the Lanham Act empowers the Court to cancel an application. To that end, the Court has not found a case where a court cancelled a trademark application on a motion for preliminary relief. Nor has Technologies persuasively shown that the Court has such authority to grant such extraordinary relief—let alone whether the Court should exercise it so early in a case.

## C. Likelihood of Success

178.    Moreover, even if the Court were persuaded that it has jurisdiction to cancel the applications, once again, the evidence Technologies puts forth does not rise to the heightened showing necessary to grant the extraordinary relief it requests.

179.    The Court is not unmindful of the potential for certain inconsistent testimony offered at the hearing and later attested to before the USPTO. Nor is it blind to the potential convenient timing of Group's request for an extension to file its statement of use with this USPTO.

71

180.    Technologies seeks cancellation based on a finding that Group's applications lack a bona fide intent. The Court first addresses what evidence is needed to make such a showing before discussing why Technologies falls short at this time.

181.    Section 1(b) of the Lanham Act requires that an applicant have a bona fide intention to use the mark in commerce "under circumstances showing the good faith of such person." 15 U.S.C. § 1051(b)(1).

182.    The Third Circuit Court of Appeals has not yet directly addressed what constitutes a showing of an applicant's good faith in this context. To date, only the Sixth Circuit, D.C. Circuit,[36] and the Federal Circuit have interpreted this language in the Act.

183.    The Federal Circuit in *M.Z. Berger & Co. v. Swatch AG* noted that the statute and its legislative history are silent on the "specific quantum or type of objective evidence required to meet the bar." 787 F.3d 1368 (Fed. Cir. 2015). The *Berger* court then found that "the evidentiary bar is not high" for the applicant to establish good faith and need only "indicate that the applicant's intent to use the mark was firm." *Id.* at 1376 (citing 15 U.S.C. § 1127). "Objective evidence of intent" could include "product or service research or development, market research, manufacturing activities, promotional activities, steps to acquire distributors, steps to obtain governmental approval, or other similar activities." *Id.* at 1376 n.5 (citing 37 C.F.R. § 2.89(d)).

184.    The Sixth Circuit in *Kelly Services., Inc. v. Creative Harbor, LLC* corroborated the *Berger* court's finding that the applicant's evidentiary bar is low. 846 F.3d 857, 864 (6th Cir. 2017); *see also* 3 McCarthy on Trademarks and Unfair Competition § 19:14 (5th ed. 2020)

---

[36]    Given the nature of its review, the D.C. Circuit did not reach the issue of what evidence satisfies § 1(b)'s requirement of evidence that objectively demonstrates an actual intent to use the mark in commerce. *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 21 (D.C. Cir. 2008).

("[E]vidence of post-application activities, if sufficiently contemporaneous, can be probative of intent at the time of application.").

185.   In the absence of in-Circuit case law, the Court looks to these cases for guidance and adopts their reasoned interpretation that an applicant does not bear a heavy burden to establish its good faith.  But it bears emphasizing that these cases had the benefit of full-blown fact discovery when considering whether the applicant lacked a bona fide intent.  That is not yet the case here. Indeed, the Court initially instructed the parties to complete "informal discovery" for purposes of briefing the preliminary injunction.  So, the Court necessarily considers an incomplete record and is cognizant of that limitation when weighing whether to grant the requested mandatory relief.

### 1. Bona Fide Intent to Use Class 9 Goods

186.   Technologies first argues that Group's goods are not "goods" that qualify as protectable trademark use.  Technologies selects testimony from the hearing wherein by which Group disclaimed that it was selling goods separate from the services it offers or intends to offer. Rather, the record reflects that Group is seeking trademark protection for its data services and the goods used to provide those services, which will bear the THEIA mark.  So, the argument goes, the Class 9 application should be voided on that basis.

187.   Technologies raises two colorable arguments in support of its cancellation claim. First, the "goods" serve merely as the conduit for Group to offer its data analytics services and lack independent value or use.  Second, the "goods" are not "transported" in commerce because the public is not aware of the transportation.

188.   The strongest argument that Technologies advances is that cancellation is warranted because the goods listed in the Class 9 application are only conduits for Group to offer its data analytics services.  Applicants have been refused registration where the goods were

"merely the means by which applicant transmits the results of its service," i.e., "the essence or gist of [the applicant's] services." *Application of S'holders Data Corp.*, 495 F.2d 1360, 1361 (C.C.P.A. 1974) (denying trademark protection for software).

189.    A cognizable challenge to a good used in trade exists when it is "(1) simply the conduit or necessary tool useful only to obtain applicant's services; (2) is so inextricably tied to and associated with the service as to have no viable existence apart therefrom; and (3) is neither sold separately from nor has any independent value apart from the services." *Lens.com, Inc. v. 1-800 Contacts, Inc.*, 686 F.3d 1376, 1382 (Fed. Cir. 2012).

190.    The *Shareholders Data* court held the applicant, who already possessed a mark for financial services, could not register the same mark for the reports generated by the service because the reports were not "goods or commodities in trade." *S'holders Data Corp.*, 495 F.2d at 1361. Moreover, the reports were "not sold separately and ha[d] no independent value apart from the services." *Id.* at 1360.

191.    It is not disputed that Group does not intend to sell its goods separate from its data analytics services. Group's witness testified as much. And it is further suggested in the record that the satellites will not be deployed for uses other than as part of Group's satellite network. Presumably, the satellites have independent value, but Group testified that it is not manufacturing hardware for the purposes of those sales.

192.    On this limited record, the Court finds that Group has at least raised a colorable argument that its goods are merely incidental to its services.

193.    Technologies also contends that Group's partnerships with unidentified sovereign nations cannot support a use of the mark "in commerce." 15 U.S.C. § 1127.

74

194.     Section 1127's "use in commerce" requirement can be satisfied by the actual sale of goods or when the goods are "transported" in commerce. 15 U.S.C. § 1127; *Lens.com*, 686 F.3d at 1380; *Gen. Healthcare Ltd. v. Qashat*, 364 F.3d 332, 335 (1st Cir. 2004). That Group may not actually sell the goods is not fatal to its request for trademark protection.

195.     When a user seeks to establish use in commerce based on transportation, "courts and commentators have required an element of public awareness of the use." *Lens.com*, 686 F.3d at 1380. Secret and undisclosed shipments generally are inadequate to satisfy the use requirement. That is because the mark merits trademark protection only when it is used in public in such a way that creates an association between it and its owner. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999).

196.     The record reflects that the goods to be delivered as part of the service package, including the satellites which will be in orbit, will bear the THEIA mark. Doc. No. 36-5 (Gallagher Depo. Tr.) at 84:7-11. It is not clear whether this use, which is perhaps a novel reinterpretation of a "good" in commerce, fails under existing trademark law. Neither party has yet addressed this argument. But the Court finds it plausible that goods which end up in orbit may satisfy the "transported in commerce" requirement when the mark is displayed on the goods (even if it is 500 miles above the Earth's atmosphere).

197.     Technologies challenges the transportation element because Group refuses to disclose the identities of its sovereign nation customers. So, it follows that the shipments of the goods to these unidentified customers may also be "secret." But absent any evidence of actual shipments, the Court finds it entirely too speculative that the shipments of a product to a separate entity outside of the United States will necessarily constitute "secret" shipments. At this time, there is no evidence that it has not or will not show the mark on the containers shipped to its

sovereign nation partners. This is because Group has yet to reach its distribution stage. So, it would be premature for the Court to find a likelihood of success sufficient to warrant mandatory relief on the basis that Group fails to establish use in commerce.

198. Although the support for the request to cancel based on "incidental" goods is colorable, the further additional relief Technologies seeks here must be evaluated on a marginal or cumulative basis. Not only is the requested cancellation mandatory in nature, the additional relief must be considered in the context of the relief the Court is already inclined to grant, i.e., enjoining the domestic use of the mark and any further steps to finalize the registrations. Indeed, the greater relief at this stage should be "no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *I.M. Wilson, Inc. v. Grichko*, No. CV 18-5194, 2019 WL 5394113, at *4 (E.D. Pa. Oct. 22, 2019) (internal quotations omitted). The Court declines to "go where no [court] has gone before."[37]

199. Given the jurisdictional issues raised above and the heightened showing necessary to warrant cancellation, the Court declines at this stage to transform Technologies' initial request to enjoin use of the mark into a full-blown cancellation proceeding for the Class 9 application. Such mandatory relief would not be tailored to the harm the Court seeks to curtail pending a merits-based determination. *See Warden v. Falk*, No. CIV.A. 11-2796, 2011 WL 3204815, at *7 n.9 (E.D. Pa. July 27, 2011) (postponing decision whether to cancel registration until parties completed discovery and briefed motions for summary judgment).

## 2. Bona Fide Intent to Use Class 42 Services

200. Similarly, the Court is not persuaded that Technologies has made a sufficiently clear showing that Group's lacked a bona fide intent to use the THEIA mark on Class 42 services

---

37      *See supra* n.1.

based on only the testimony regarding the anticipated date the Theia Satellite Network will fully deploy.

201.    Technologies cherry picks testimony from Group to argue that Group would not fully deploy the satellite network until 2023. On that basis, Technologies contends that Group knowingly misrepresented to the USPTO its continued bona fide intent to use the Class 42 services because it had already acknowledged to this Court that those services could not be used in commerce by the 2022 allowance date. But the supposed timeline that one particular product will reach the market by 2023 says nothing about Group's ability to bring some other product within the Class 42 services by 2022 to market. Indeed, Mr. Fargnoli testified that "[t]here is the possibility of delivering data analytic services earlier than [launch of the TSN] on an aircraft platform" and that he would "safely say at some point this year" Group will offer those services. The Court will not find at this time that Group lacks a bona fide intent to use as regards its data analytics services offered under Class 42. Moreover, time remains in the allowance period and the alleged lack of bona fide intent rests on a potential inconsistency (rather than a clear-cut instance of fraud or perjury—as Technologies urges the Court to find).

202.    Technologies cites no cases that discuss intent-to-use application under § 1(b). In fact, the cases that it does cite discuss only § 1(a) use-in-commerce applications, i.e. when the applicant has already used the mark in commerce. The distinction between these sub-sections is important because, as Technologies correctly notes, mere preparatory acts are not enough to constitute "use in commerce" for § 1(a). *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350 (Fed. Cir. 2009). But §1 (b) addresses the applicant's intention or at least evidence of intention, which would by its nature includes preparatory acts.

203.     For that reason, the Court does not find either *Aycock* or *Couture v. Playdom, Inc.* persuasive because neither involved an intent-to-use application under § 1(b). 560 F.3d 1350 (Fed. Cir. 2009); 778 F.3d 1379 (Fed. Cir. 2015). Moreover, the cases cited in *Aycock* (which voided applications) pre-date the current version of the Lanham Act, which permits applying for a mark before it is used in commerce provided the applicant has a "bona fide intention to use the mark."

204.     Similarly, the Court declines to play "gotcha" with the scope of Group's application based on carefully selected answers in testimony. Group's Class 42 application includes, among other things, "data analysis" of information collected through its planned satellite network. Group explains that it intended to offer those analytics prior to the official satellite network launch via aircraft. The Court will not endorse a cramped reading of Group's application where the record does not evince a clear intent to narrow the scope of the Class 42 service application. With them, the force of this argument is not.[38]

205.     The Court does take note of the peculiar timing of Group's filing an extension of time to file its statement of use. However, in the light of the insufficiency of the facts, the record does not allow the Court to find that Technologies has made a heightened showing to demonstrate a likelihood of success on the merits to void the application for Class 42 services at this time.

## D. Irreparable Harm

206.     Mandatory injunctions are "more burdensome than prohibitory injunctions and disturb the status quo prior to final adjudication." *Tri-Realty Co.*, 2013 WL 5298469, at *12 (internal quotation omitted). That is why, when the party seeks a mandatory injunction, it "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

---

[38]     *Cf.* Yoda, Registration No. 2,540,705.

207.    Technologies has not shown how the prohibitory injunction THAT the Court is prepared to enter is so insufficient to redress its alleged harm as to merit entry of preliminary mandatory injunctive relief.

208.    To the extent the issuance of a prohibitory injunction been later then would be preferable, Technologies materially contributed to the delay with its eleventh-hour request for relief—which it dropped into its proposed findings of fact and conclusions of law and which necessitated additional rounds of briefing and evidence.

209.    Although the Court does not order injunctive relief that cancels either pending application, Technologies may endeavor to amend its complaint to seek this additional form of relief.

210.    Because the Court will not order such mandatory relief, it need not reach Technologies' related request for the Court to enjoin Group from converting its International Registration into a Japanese national registration.  That is because such relief was contingent on the Court first cancelling the U.S. applications—which it declines to do here.  Moreover, as the Court set forth above, the Court concludes that extraterritorial application of the Lanham Act is not appropriate at this time.[39]

---

[39]    As the case proceeds, Technologies, however, is not prevented from presenting additional evidence later to support a permanent injunction applied extraterritorially—should such evidence exist.

**V.      Conclusion**

For the reasons set out in this Memorandum, the Court denies in full Group's motion to dismiss in full and Group's motion to strike.   The Court grants Technologies' motion to supplement the record and grants in part Technologies' motion for a preliminary injunction.

The Court grants the relief initially requested by Technologies' in its Motion for Preliminary Injunction.   The injunction shall not issue until Technologies posts the bond.

The Court denies Technologies' additional request to cancel Group's pending trademarks and to enjoin Group from converting its International Registration into a Japanese national registration at this time.

An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**